[No. S009522. Nov. 5, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
LESTER ROBERT OCHOA, Defendant and Appellant.

## COUNSEL

Russell S. Babcock and Nancy J. King, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Marc E. Turchin, Susan D. Martynec, Susan Lee Frierson, Robert S. Henry, Carol A. Greenwald and Arthur H. Auerbach, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant was convicted of murdering Lacy Corrin Chandler and awaits execution of a resulting death sentence.

Following the consolidation of two cases against him, an information filed by the Los Angeles County District Attorney on April 25, 1988, charged defendant with murdering Chandler. And it alleged two felony-murder special circumstances in connection with her murder: that she was murdered during the commission of a forcible rape and a kidnapping. It also alleged

that he personally used a knife to kill her. It alleged that these events took place on or about June 18, 1987.

In separate counts, the information charged defendant with forcibly raping and kidnapping Chandler. And in further counts, it charged him with the kidnapping for robbery, simple kidnapping, robbery, forcible rape, forcible rape in concert, forcible oral copulation, forcible oral copulation in concert, rape by means of a foreign object (namely, fingers), attempted forcible sodomy, and attempted forcible sodomy in concert, of Charlotte J. It alleged that these events occurred on or about January 28, 1987.

The information also charged defendant with attempting to murder Yolanda A., and alleged that he personally used a knife and personally inflicted great bodily injury during that crime. It also charged him with assault with a deadly weapon and causing great bodily injury, assault with intent to rape, and residential burglary in the attack on Yolanda A. It alleged that these events took place on or about May 23, 1987.

The jury found defendant not guilty of attempting to murder Yolanda A. It also found not true the allegations that he personally inflicted great bodily injury on her. Instead it found him guilty of assaulting Yolanda A. with a deadly weapon or by means of force likely to cause great bodily injury. It found him guilty of all other offenses charged, and found true all other allegations. The foreperson wrote on the verdict form "[b]urglary of the first degree" regarding the residence of Yolanda A. After a penalty trial the jury returned a verdict of death, and the trial court refused to modify it. We affirm the resulting judgment.

THE GUILT PHASE

*Facts*

Defendant was charged with involvement in three criminal incidents, culminating in Chandler's murder. We describe them in chronological order.

*The Victimization of Charlotte J.*

Charlotte J. testified that she was returning to her apartment shortly before midnight on January 28, 1987, when defendant grabbed her from behind, knocking her glasses off. He told her to hand him her purse, which she did. Rather than release her, he forcibly took her behind a garbage dumpster, handed her purse back to her and told her to give him money. Again she complied. At that point Edward Ramage joined them.

Defendant tried to keep Charlotte J. from seeing him, and she is near-sighted, but at one point during her abduction the headlights of a passing car enabled her, or helped enable her in conjunction with other lighting, to observe his left profile from less than a foot away. At the time they were kneeling to avoid being seen. She never saw his face. Throughout the incident he would push her head down when she looked in his direction.

Defendant and Ramage took her over a wall, past the rear of a liquor store and down a street. Finally they climbed one perimeter fence and passed through another, entering the grounds of the Florence Flanner School a few blocks away. On the school ground he forced her to remove her clothes and to get down on hands and knees, and she was blindfolded. Defendant had her orally copulate him while Ramage engaged in vaginal intercourse. Then the two assailants switched positions. At some point defendant took her wedding ring. Defendant also attempted to engage in anal intercourse but was unable to penetrate the victim, despite inserting his fingers in her rectum and trying again. Ramage also tried but could not engage in anal intercourse (although he would later testify that he did do so). Charlotte J. testified that defendant appeared to be in charge, and she noticed that Ramage was shaking when he would touch her. She heard Ramage ask defendant not to hurt her, and they allowed her to re-dress. She asked defendant for her wedding ring back, but he did not respond. The incident ended after about three hours, when they released her.

Defendant cross-examined Charlotte J. about the accuracy of her identification of him. He elicited from her that she is five feet five and one-half inches tall and had previously believed that she, defendant and Ramage were all the same height. She told a responding police officer that she could envision defendant's appearance but not describe him verbally. He elicited other failures of memory regarding details of the crimes against her. The responding police officer testified that she told him she did not see her attackers.

On redirect examination, Charlotte J. explained that she never saw defendant standing so as to be able to give an accurate description of his height.

An emergency room doctor testified that Charlotte J. showed physical evidence of oral copulation in the form of bruising of the hard palate, and of attempted sodomy in the form of trauma above the rectum.

Ramage testified that he and defendant raped Charlotte J. on the date in question. Ramage had seen but did not know defendant before the day of the rape, when they met on the street. Defendant asked Ramage to obtain

cocaine for him; he obtained a quarter of a gram and the two consumed it. They parted ways, but a few minutes later Ramage encountered defendant detaining Charlotte J. between two trash bins. He was rummaging through her purse and telling her that he would harm her if she screamed. He also took her wedding ring. Ramage wanted to leave but defendant told him not to and lifted up his shirt, revealing a small gun.

After they raped Charlotte J., defendant called Ramage to one side and said, " 'I can't take no chances[;] I'm going to have to kill her.' " Ramage insisted that he not. Instead Ramage gave her his sweater to shield her from the cold and told defendant that he did not want any part in a murder and that defendant would have to kill him too. Defendant took out "a knife from his sock and he starts switching it back and forth and I just said, 'Come on,' you know, kept pleading with her [*sic*], just let her go." (In her own testimony, Charlotte J. described hearing a clicking sound a few times as she heard Ramage asking defendant not to harm her.) Defendant relented and Ramage told Charlotte J. to run as soon as she got over the fence.

Ramage admitted that he would converse and smoke marijuana with defendant on occasions after the incident. And on cross-examination, defendant tried to undermine Ramage's account of events. He asked why Ramage had not fled when he had opportunities to do so during the rape, and why he did not search for the gun while defendant was committing sexual crimes against the victim. Ramage replied that because he felt panicked, he was already implicated in a rape, and it benefitted Charlotte J. for him to stay (he had testified that he feared defendant would kill both of them if he made a false step), he felt he could not leave. Defendant also elicited prior inconsistent statements by Ramage, a discrepancy in statements regarding his whereabouts on the night of the murder of Lacy Chandler, and other discrepancies in the accounts given by him and others at trial. On redirect examination, Ramage explained that he was assuming that the murder occurred on a particular night when questioned by the police and he gave them his whereabouts on the basis of his assumption.

Detective John Aquino, then an officer of the Baldwin Park Police Department, testified that when he arrested Ramage for the crimes against Charlotte J. he blurted out, "Lester [defendant] made me do it. I didn't want to do anything." Ramage gave a confession that conformed to his in-court testimony. The confession was not coerced; rather, Ramage was eager to tell the story from the time of his arrest. Aquino also testified to the lineup procedure (described further *post*, at pp. 411-412): he showed Charlotte J. two 6-photograph lineups, one containing defendant and the other Ramage. She identified Ramage with 80 percent certainty. She identified defendant

from the other six-photograph lineup, but apparently was not positive until Aquino produced, at her request, a photograph of defendant's profile.

Defendant called an experimental psychologist, Dr. Kathy Pezdek, to testify about the possible effects of the traumatic events on Charlotte J.'s memory as an eyewitness. She opined that Charlotte J.'s ability to identify defendant may have been diminished by the fact that she was missing her glasses, that she saw only his profile and only for a short time, that she and defendant belong to different ethnic groups, that the situation was stressful, that she did not see a photograph of him until months after the assault, and that in-court identifications contain a risk of suggestiveness. She cited research that concluded time of exposure to a face and delay in identifying it were the most important factors affecting the accuracy of memory. She testified that the six-month delay in Charlotte J.'s identifying defendant alone would cause a low probability of an accurate identification, and that repeated viewings of him in lineups and hearings would influence her to believe that the man she identified in court, i.e., defendant, was her assailant. She explained that Charlotte J.'s statement that she was positive in her identification could not be trusted under the circumstances.

### The Attack on Yolanda A.

Defendant is Yolanda A.'s brother-in-law. On May 23, 1987, Yolanda A. entered her house and found defendant lying in wait for her behind the front door. He grabbed her and held a knife to her throat. He told her that he wanted to discuss problems he was having with his wife, Yolanda A.'s sister, Elva Ochoa. They argued for a few minutes. He then escorted her at knife point to the bedroom and told her to lie down. She resisted and the two struggled. He choked her into unconsciousness, but his assault was interrupted: Yolanda A. awoke to find her cousin Faviola Ambriz, who lived in the house, standing in the bedroom doorway. She told her in Spanish to call the police. When defendant saw Ambriz he stopped the attack, then resumed struggling with Yolanda A., finally apologized, and told her not to tell anyone about it. She went to the hospital and had difficulty swallowing for a week afterward. Her neck and eyes remained sore for a longer time and the corner of her right eye exhibited what she thought was blood. A doctor testified that an eye injury of that type could arise from strangulation.

On direct examination Yolanda A. testified that defendant did not have permission to be in the house. On cross-examination defendant elicited testimony that he had once lived in the house with his family and still had possessions in the bedroom in which he assaulted her. He also elicited that she did not require treatment at the hospital and suffered no permanent physical harm.

Ambriz testified through an interpreter that she opened the bedroom door to find defendant with his hands around Yolanda A.'s neck.

### The Rape and Murder of Lacy Chandler

The amateur detective work of Saundra Jean Baxter, the conscience of Edward Ramage, and the chance encounter of the two all combined to help solve the case of the rape and murder of sixteen-year-old Lacy Chandler.

A forensic pathologist testified that Chandler died of stab wounds. There were 23 of them, averaging approximately 4 inches deep. She exhibited no genital or rectal trauma.

Baxter, Chandler's housemate, testified that about two and one-half weeks before Chandler's murder, she moved into a room with her boyfriend Juan Carlos Alvarado. Baxter and her boyfriend shared another room in the same house. Baxter described Chandler and Alvarado as having a very close relationship; Chandler was not interested in other men.

Chandler planned to take Alvarado to work at 3:00 a.m. on June 18, 1987, and then return with his car so she and Baxter could visit Chandler's mother later that day. About 7:00 a.m. Alvarado phoned the house looking for Chandler, but Baxter could not locate her in the house or the grounds, though she saw Alvarado's car parked and locked outside. She called Alvarado back to report that Chandler was missing. He returned from work at 3:00 p.m., and the man who drove him home noticed an unopened five-pound bag of sugar next to Alvarado's car. This alarmed her—she had not noticed the sugar at 7:00 a.m.—and she saw a startled look on Alvarado's face as well when the sugar was discovered. He called the police and she walked to a neighborhood liquor store to buy some cigarettes.

Unknown to them at the time, a school district police officer had discovered Chandler's body on the grounds of Florence Flanner School about 7:30 that morning. It was bloody, was pierced with knife wounds, and was supine. Drag marks suggested that it had been dragged back and forth about 10 feet before being deposited near an incinerator. An investigator took casts of shoe prints located about 20 feet from the body. He could only find one kind of fairly clear shoe print in the area, though on cross-examination he acknowledged that there was other evidence of foot traffic that could not be identified. He also found false fingernails that lay scattered about in the nearby grass.

On her way back from the liquor store, Baxter took a circuitous route in search of Chandler. Instead she encountered Edward Ramage, and although

she did not know him and had seen him only once before, she told him that Chandler was missing. Ramage said he had not seen her. Baxter saw that the police had arrived at her house and told him she had to go.

About two days later Baxter again saw Ramage, this time at a neighborhood fast-food restaurant. She asked him to join them, saying " 'I want to talk to you,' " and he obliged. They discussed Chandler's murder. "[H]e seemed pretty streetwise, really, and I asked him, I says, 'Do you know anybody in the neighborhood or in the near vicinity who would know or who you might have heard or anything that might have done something like that to somebody.' He says, 'Well, yeah,' you know."

Ramage proceeded to tell Baxter a self-serving version of the still-unsolved assault on Charlotte J., in which he interrupted another person's rape of her. He told her the rape had occurred a few weeks before. Evidently Ramage said he knew the rapist's identity. Giving him a pen and paper, she asked for the individual's name and address and the license number of any automobile belonging to him. Five minutes later and out of breath, Ramage ran back into the restaurant and gave her a piece of paper with the name "Mike" (the record is unclear whether Ramage in fact wrote down an incorrect name; he only knew defendant as "Lester") and an address. Baxter called Los Angeles County Sheriff's Detective Douglas Oberholtzer with Ramage's information.

The police testified before the jury in conformity with their testimony at the *in limine* hearing on the admissibility of defendant's confession (set forth in detail *post*, at pp. 392-396). Aquino described an interview with Ramage, the subsequent questioning of defendant, his initial confession, and the retrieval of a knife where he said he had hidden it. Stanley White, then a Los Angeles County Sheriff's Department homicide detective, testified that a tape contained defendant's later, recorded confession, and the prosecution played it for the jury.

Defendant gave his 12-minute-long taped confession at 11:40 p.m. on June 25, 1987, in the presence of White, Aguino, and Downey Police Officer Edgar Compton. In answer to White's questions, he said that he was walking down a street at 3:00 a.m. on June 18 by himself and spotted a blonde girl wearing white pants and a sweatshirt and standing by a car. He approached her and told her to be quiet. She saw that he had a knife. He took her to Florence Flanner School, where they climbed a fence simultaneously. He took her over to an incinerator by the auditorium. He asked her—but did not tell her—to take off her pants, and she complied. She lay down atop her pants on the grass and they engaged in intercourse. She asked if she could

put her pants back on, and he gave permission. He then described stabbing her to death because he was scared that she might lead to his apprehension:

"Q. After she put her pants on, then what happened?

"A. Uh, I stood there a little while, and—and then uh, I got scared—I mean I was there for a little while, quite a long time so, I thought I'd get caught or something, I don't know what was going through my mind, I was so high.

"Q. But you were frightened?

"A. Yes, I was frightened and I'd done probably about a hundred dollars worth of 'coke.'

"Q. Uh-huh.

"A. More than ever I had done before, and uh, I stabbed her.

"Q. You stabbed her.

"A. And then she told me to leave and I felt sorry for her and then I got scared because you always think, you know you see it in the movies—girls would scream and yell and—

"Q. Yeah.

"A. She seemed like she was concerned about me—to get away and leave.

"Q. This was after you stabbed her?

"A. Yes. And I felt [unintelligible] her—seemed like she was worried about me—at the same time scared for herself, and I was scared for me and her—I guess I killed her.

"Q. You stabbed her some more times?

"A. Think so. I don't know how many."

Defendant stated that he thought he had stabbed Chandler three times in the chest and also in the neck. White asked if he had dragged her body. He replied that he thought he had.

"Q. And why did you do that?

"A. Just like—I don't think I hid her—uh, *way* behind the incinerator.

"Q. What—you were trying to hide her, is that it?

"A. "Yeah, and I don't think I really did a good job of it, uh, but I did drag her.

"Q. Okay.

"A. Scared."

Defendant gave equivocal statements on whether he and Chandler had struggled at any point, at first saying she did not fight him at all and then that "when we were walking to the school she didn't."

Defendant returned home and washed his tennis shoes, which were greasy, in the kitchen sink. When the police came to visit him later, the murder knife was in his house, hidden above a false ceiling. He decided to rehide it where the police later recovered it.

He denied any involvement in the assault on Charlotte J. Asked whether he had "raped other girls before," he said no.

Ramage testified that on the morning of June 18, 1987, he heard about a murder at the Florence Flanner School grounds, quickly concluded that defendant was capable of having committed it because he had been willing to kill Charlotte J., and relayed his suspicion to several others. When Baxter brought up the subject at the fast-food restaurant, he felt that he had to do something and immediately obtained defendant's address for her. He denied any involvement in Chandler's murder.

Ramage described the circumstances of his plea bargain arising from the assault on Charlotte J. He was sentenced to eight years in prison and agreed to testify against defendant. He stated that the agreement called for him to tell only the truth in testifying.

During the cross-examination described *ante*, at page 383, defendant tried to raise a question in the jurors' minds whether Ramage might have killed Chandler. He asked Ramage whether he told Danny Foster two or three days after Chandler's murder that he had seen a girl stabbed to death on the school grounds. Ramage denied having told him so. He also denied having told Rosie Cerna that he had been present at the murder, or having described Chandler's stab wounds to her. And he denied that a statement he made to

the police about the precise location of Chandler's body came from personal knowledge—rather, it came from information the police supplied during their interview of him.

Alvarado testified that Chandler drove him to work about 2:45 a.m. on the day she was killed. They had engaged in sexual intercourse earlier that night. When he last saw her she was clean and free of bruises, scratches, or scrapes. She was wearing a sweatshirt in normal fashion—i.e., with an emblem facing out. As she dropped him off he asked her to buy sugar. He called the police after returning home and seeing the unopened sugar near his parked car.

A criminalist from the coroner's office testified that at the crime scene she found dirt underneath Chandler's waistband. She believed that the dirt and debris on her body came from the crime scene, suggesting that she was killed where the school district police officer discovered her. Her pants were on backward and her sweatshirt was inside out.

White testified that holes in the inside-out sweatshirt correlated with the stab wounds. The loose and leaf-strewn soil in the area made it easy to see that, as mentioned, Chandler's body had been dragged in two directions about ten feet. Her socks were thick with burrs and leaves; no shoes were found at the scene. Adding to the criminalist's testimony, White explained to the jury that he found only "[o]ne type of shoe print but many prints in the area."

Another criminalist compared plaster shoe print casts and photographs taken from the crime scene with the soles of shoes defendant gave the police after their initial visit to his house. He testified that one of the shoes had sole patterns and a size consistent with a cast and a photograph taken at the crime scene, although neither contained enough detail to yield an exact match to the actual shoe.

Blood evidence was inconclusive. A serologist testified that defendant is a nonsecretor and therefore blood-type tests done on semen found on Chandler's pants and on rectal and vaginal samples taken from her body could not identify it as his, although the semen found on the pants could have come from her boyfriend Alvarado, assuming that only his semen was present there. Moreover, there was too little semen on the vaginal and rectal samples to be able to be able to classify it according to blood type, and therefore it could have come from Alvarado as well. She also testified that a minute amount of blood from a larger primate—a taxonomic order that includes human beings—was found on the knife defendant produced for the police.

And she testified that three false fingernails collected at the crime scene tested positive on a presumptive test for blood, but because of a laboratory problem she could not determine whether the substance was human blood.

Toxicological tests revealed no trace in Chandler's blood of cocaine or other commonly abused drugs.

Defendant did not testify in his own behalf, nor did he make an opening statement. His strategy was to suggest that Ramage was Chandler's killer. Accordingly, he called Ramage as his first witness, and Ramage acknowledged that when Baxter approached him he was feeling that others suspected him of involvement in the murder. But he denied telling Rosie Cerna that he was present at the murder, or telling Adrian Cervantes that he and defendant met Chandler on the street and she went with them willingly. And neither Cerna nor Cervantes could recall Ramage having made such statements. Cerna's testimony was impeached by that of Aquino, called as defendant's witness, who testified that Cerna told him that Ramage told her, in counsel's words, "that [defendant] started stabbing [Chandler] and he Ramage freaked out," and that Cervantes told him that Ramage said that he and defendant had met Chandler on the street and she went with them willingly. On cross-examination, however, Aquino explained that each interviewee was uncertain about what Ramage may have said.

Defendant also adduced damaging character evidence about Ramage: twelve-year-old Monica O. testified that when she was eight or nine years old Ramage sexually assaulted her. A month earlier he had exposed himself to her. And a neighbor testified that Ramage customarily wore a buck knife.

Defendant also introduced evidence regarding his history of drug use and its effects. Dr. David Gorelick, a psychiatrist with a doctorate in pharmacology, testified that cocaine use can make an individual violent and that such violence might be an aberration. His testimony did not pertain to defendant's own psychology or his mental state at the time of the crimes, but rather on the possible effects of drug use generally. Allan Figueroa, a friend who had known defendant for 14 years, since elementary school, testified that defendant started using drugs at age 11 or 12 (marijuana and alcohol), graduated to phencyclidine in ninth grade, and during high school was a heavy consumer of phencyclidine and marijuana. About age 20 he also began to use heroin and cocaine. In recent years "[h]e was loaded most of the time." When intoxicated "[h]e became belligerent, arrogant, violent, incohe[r]ent." When sober, he would be "[p]assive, comical, witty, somewhat intelligent." "He didn't lose his temper when he wasn't on drugs."

At closing argument, defendant argued that even though he confessed to killing Chandler, he did not commit first degree murder, but second degree

murder. He acknowledged that he killed her intentionally, but argued that the prosecution had not proved beyond a reasonable doubt that he acted with premeditation and deliberation. In his view, the evidence of multiple stab wounds showed that he killed in a frenzy, not with calculation. He also asserted that his consumption of an unprecedented quantity of cocaine on the night of the murder caused him to lose his faculties. In sum, he was not able to deliberate, and because of voluntary intoxication he lacked the "ability to form the specific intent and mental framework" to commit a premeditated and deliberated murder.

Defendant also argued that the prosecution did not establish the corpus delicti of kidnapping Charlotte J. for robbery—i.e., "the evidence was . . . inadequate to prove . . . that anybody committed" that crime. He maintained that her purse was rifled before she was moved. With regard to the other charges involving Charlotte J., he asserted that the prosecution had not proved he was the individual who committed those crimes alongside Ramage. Charlotte J.'s own testimony was flawed because of failures of perception and memory and because the lineup procedures were suggestive. Ramage's testimony was not to be believed, first because he originally provided information about defendant's possible culpability to avoid being suspected of murdering Chandler, and, second, because he wanted to avoid a long prison sentence for the offenses he committed against Charlotte J. Finally, defendant queried why he would admit to murdering Chandler but deny the attack on Charlotte J.

With regard to the attack on Yolanda A., defendant conceded that he was guilty of assault with a deadly weapon or with force likely to produce great bodily injury, but that was all.

In sum, defendant sought to persuade the jury "not that [he] is not guilty of any crimes," but that he was not guilty of many of the crimes charged.

*Guilt Phase Issues*

*Motions Regarding Defendant's Inculpatory Extrajudicial Statements*

The trial court held an *in limine* hearing (Evid. Code, § 402) on defendant's motion to suppress, as improperly obtained, his extrajudicial inculpatory statements—i.e., his confession that he killed Chandler and hid the knife—and to exclude evidence of the knife as deriving from the involuntary statements. It held another hearing to rule on his contention that the prosecution had not established the corpus delicti of rape or kidnapping.

*Confession-related Issues*

Defendant challenged the admissibility of his statements under various legal theories. In the trial below, he identified four bases for his challenge.

First, police harassment of him and his family coerced him into taking a polygraph examination. Second, he should have been advised of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974], before being given the examination. Third, when they did try to advise him of his *Miranda* right to counsel after giving the examination, he failed to understand the admonition and therefore did not knowingly and intelligently waive the right. Fourth, he confessed in exchange for false promises of lenity. He renews these contentions on appeal.[1]

*Facts*

The prosecution presented witnesses at the *in limine* hearing who testified about the circumstances surrounding defendant's confession.

As stated, John Aquino was a detective for the Baldwin Park Police Department. He testified that he received a call on June 18, 1987, that Chandler's body had been found at Florence Flanner School in that community. White and Oberholtzer were assigned to investigate. There was no homicide suspect in the following days.

On receiving Saundra Baxter's information, White interviewed Edward Ramage, who told him that "Mike" "lived down the street from him and was very strange . . . and possibly could be the suspect in our murder case."

Aquino and the other detectives went to the address and found defendant outside. He identified himself as Lester, not Mike, and invited them inside. As they walked in all three detectives tried to see the bottom of his shoes to compare them to shoe prints at the crime scene. His soles were "very similar" to the shoe prints.

The officers asked defendant if he would take a polygraph examination "so we could exclude him as a possible suspect." At this point Aquino "didn't really feel he was involved"; he thought the chances of his being the perpetrator were 25 to 30 percent. Defendant told the officers that he was with a man named Tony Liaiono until 12:00 or 12:30 a.m. on the night of the

---

[1]He also contends that the police arrested him at his apartment without probable cause, in violation of the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution. This claim, not presented at trial, was not preserved for review. "[I]t would be wholly inappropriate to reverse a superior court's judgment for error it did not commit and that was never called to its attention." (*People* v. *Lilienthal* (1978) 22 Cal.3d 891, 896 [150 Cal.Rptr. 910, 587 P.2d 706].) Defendant contends in his reply brief that he did litigate the Fourth Amendment claims, but the pages he cites do not support his assertion.

The same reasoning applies to defendant's claims, raised on appeal but not before the trial court, that the police failed to respect a purported invocation of his rights to silence and counsel. These too were not preserved for review.

murder. (White later testified before the jury that defendant also said he came home afterward and stayed home all night.) But *Liaiono said he last saw defendant at 7:00 to 7:30 p.m.*

Aquino and Baldwin Park Police Detective Barry Bazzell went to get defendant for his polygraph examination on June 25, 1987. Bazzell is six feet two inches tall and weighs two hundred twenty to two hundred thirty pounds. Defendant said he was not going with them and that his father wanted to speak with them. His father told them that he had spoken to a lawyer and had decided that defendant should not take the examination.

Bazzell immediately got into a shouting match with the father. It was "very heated." Seeing that "[t]he situation was going downhill quickly," Aquino intervened and said there was no need for an argument. He never heard Bazzell threaten to arrest defendant's father or to tear the house apart if the father did not leave the room.

Once Aquino intervened, the situation calmed down quickly. He was on his way to leave, along with the other officers, but went back to the living room to apologize to defendant's father. He explained that " '[w]e had reason to believe that Lester [defendant] might possibly be involved. One way to clear him is with a polygraph. It's strictly voluntary, and sorry for the disturbance . . . .' "

Defendant then asked, in Aquino's words, "if he passed the test would we leave him alone," and Aquino responded, "Lester, if you're not our suspect, I'm not going to waste the investigation time with you." Defendant changed his mind and agreed to take the test. He was searched for safety reasons before being put in the patrol car, but was not handcuffed or told he was under arrest.

Downey Police Department Detective Dwight Hooker testified that he administered a polygraph examination to defendant. He put him in a public waiting room from which he was free to leave until he could get information on the case and prepare the questions. He came back 30 to 45 minutes later to take him to the examination room. Initially the two were in the room alone. He explained that taking a polygraph test is voluntary and handed defendant a waiver to sign. He appeared to read it. (The record shows that he signed it in two places. For the waiver's text, see *post*, at p. 402.) Hooker read him the questions in advance and had him answer before hooking him up to the machine.

Explaining the polygraph procedure required some 15 minutes. Hooker performs this explanation so that the waiver will be "a little bit more

intelligent . . . ; they know what they're signing." At no time did defendant ask for a lawyer or say that he did not wish to be present or to take the test.

The test consisted of 10 or 11 questions on 3 different charts, for a total of 30 to 33 questions. Administering it required about one and one-quarter to one and one-half hours, and it began at 6:15 p.m. Afterward Hooker reviewed the results and told defendant he thought he had failed the questions regarding Chandler's death. He then read him his *Miranda* rights from a card. Asked if he wanted to give up his right to counsel, defendant said he did not understand the question. "So I better explained it to him by saying, 'This means do you want to have a lawyer right here, right now while I talk to you about this case?' [¶] At that time he says, 'No, I want to talk to my mother. I need to talk to my mom.' " (Defendant was 26 years old at the time.) Hooker denied that request and began to question him about the murder. He told defendant he thought he was involved in it. Initially defendant denied it. The interrogation's tone was "a low-key interrogation, more or less a discussion . . . . It was more or less almost a conversation." Hooker said several times that "I truly believe now that you killed the girl."

At 8:30 p.m. Officer Compton, who was also a polygraph examiner, joined the two. He came in to read the charts. Compton told defendant the polygraph showed he was involved in the murder. The police continued to talk to defendant about another hour. They told him, " 'Now's the time for the truth to come out. It's something that's going to eat at you and eat you away.' "

At approximately 9:30 p.m. defendant "blurted out," in Hooker's words, " 'I didn't mean to kill her,' [and] started to cry." "We comforted him a bit. Then he said, 'I didn't mean to kill her, I got scared, I was loaded on cocaine.' "

Hooker testified that there was no discussion of the consequences of failing to confess or about a murder conviction. Nor was there any discussion about the penalty for murder. Nor did defendant ask for any favor in exchange for a confession. Hooker did not threaten him or make any promises to him.

Compton testified that he came into the polygraph room at 8:30 p.m. at Hooker's request to examine the polygraph results. He told Hooker he thought defendant's answers were deceptive. Defendant could hear this. Compton told him he thought he was involved in the homicide. Hooker and Compton continued to talk to him for some time. He began to cry and said, "I didn't mean to kill her." Neither Compton nor Hooker threatened defendant in any manner while Compton was present.

White came in and readmonished defendant as to his *Miranda* rights from memory and took a statement from him. He said "that he'd been out walking that evening; that he'd come across a girl down the street from his house. He'd taken her at knife point over to Florence Flanner School, had gone over by the incinerat[o]r, had intercourse with her, stabbed her to death, and then later told me that he had hid the knife at some apartments not far from his house."

Defendant offered to produce the knife and said that he wanted to explain events to his parents. White agreed. They went to an address on Puente Avenue. Defendant pointed to a hole in a wall and White retrieved a knife from it.

Then they went to defendant's house. "I didn't take notes," Aquino testified, "but I remember Lester saying to his family that, 'They're booking me for murder,' that he killed the girl at the school, and his wife and his mother bec[a]me upset and were crying." Defendant accused his family of culpability for the homicide because they hadn't gotten him help, evidently for emotional problems. "There was another conversation . . . . [¶] I remember his father was standing like in a hallway facing the living room leaning against the doorjamb, and he said to him, all I want—I only want to ask you one thing, did you do it, and he said he did, . . . and we left."

They went back to the Baldwin Park police station, where defendant gave the taped statement described *ante*, pages 386-388. White did not threaten him or offer him any promises of leniency. Defendant had stated at the Downey police station that he needed help for his emotional problems. White probably said briefly "We'll get you help." The only benefit defendant affirmatively asked for was that the story not appear in the newspapers. They did not discuss the penalty for homicide or a lesser prison sentence.

Defendant presented his own and his parents' testimony. His version of events differed dramatically from that of the police.

In his own testimony on direct examination, defendant confirmed that on June 22, 1987, White drove up in a black van and asked if he was "Mike." White also asked him for a physical form of identification. Defendant said it was inside, and he went in, followed by White. Defendant turned around and saw "a silver nickel-plated .45 automatic and I got shook up." The two were alone at the time. "I asked him, 'Why are you doing this?' He says, 'Walk right.' "

White and Oberholtzer questioned defendant about his activities on the evening of the homicide. They asked to see the bottom of his shoes and

Aquino said, "That's them." The police officers confiscated the shoes without permission. They told him they were investigating a schoolyard murder and asked if he knew anything about it. He said he had read about it in a newspaper.

White asked defendant if he would take a polygraph examination. "His exact words to me were, 'If you don't take the polygraph, we're not going to stop harassing you.' " But he either refused to take the test or told him he wanted to talk to a lawyer or someone else first. He also said he would let White or someone else know whether he would take the test. He denied having a knife.

After talking to an attorney his mother had contacted, defendant decided not to take the examination. He left two messages with Aquino at the Baldwin Park police station that he would not undergo it.

On June 25, Aquino and a large-framed detective (presumably Bazzell) came to the house. Aquino asked defendant if he was ready, and he said he was not going to take the test. Bazzell and defendant's father started arguing. Bazzell said, "He's a grown boy. He can make his own decisions." Bazzell also said, "We can tear this whole house apart." His father replied, "Go on right ahead and you'll see what will happen." Bazzell said that if defendant didn't go, "we'll have to do it the hard way." Aquino, by contrast, "was calm through the whole thing."

Defendant was concerned for his father's well-being. When defendant went to his bedroom because he did not wish to participate in the argument further, Bazzell led him by the forearm. He was debating whether to take the examination "just to satisfy them." He felt at that point that he was a suspect. But he "went to take it [the examination] to get them off my father's back, off my back and leave us alone."

At the Downey police station defendant was put in a room with an open door and waited one and one-quarter to one and one-half hours for Hooker to return. It had a phone. A woman wearing "rookie" clothing told him not to leave. She was working about 30 to 35 feet from him. As he was moving around, she told him to " 'stay put,' and I asked where the detectives were at. She didn't tell me where. Because they took a long time to get to me." "No one ever told me I could leave [the Downey police station] any time I felt like it."

Asked why he signed the consent form for the test under such adverse circumstances, defendant replied that there was no point in explaining it to

Hooker, who already knew that he was there involuntarily. But he conceded that in the polygraph room, Hooker told him that he didn't have to take the examination. He took it anyway because "they wouldn't let me go home" and he didn't feel free to leave the police station.

After telling defendant that he had failed the test, Hooker recited his *Miranda* rights to him. Defendant did not understand the part about having an attorney present prior to any questioning. Hooker pulled out a *Miranda* card and read his rights to him more slowly, but he still did not understand the right to counsel aspect. Again he asked to see his mother so she could get in touch with his attorney. Hooker said it was too late for that.

Compton told him, "It's up to us if you go home." And then he stated, "It's up to us if you get 15 years." Then from 15 years he dropped down to 9. From nine years he dropped down to seven, and then from seven years he dropped down to three. Compton also said, "It's up to us if you get 15 years because whatever we say in court goes. We're policemen." Eventually he promised him a three-year sentence, or seven years at most.

Defendant confessed that "I did it" about 9:30 that night. He confessed in hopes of getting a three-year sentence. Compton told him he had to confess if he wanted to receive that term.

White was then brought into the examination room. He read defendant his *Miranda* rights. Defendant confirmed to White that he had committed the homicide.

On cross-examination, defendant conceded that he did not tell White that he didn't understand part of his *Miranda* rights. He felt it would be a waste of time to do so.

Defendant testified that the transcript of his taped confession accurately recites that he told White he stabbed the victim. The police did not force him to make that statement, but they induced it: they told him that if he gave it he would get what he wanted—a reduced sentence.

Defendant testified that he did not know whether he killed Chandler. Neither did he know what the police were going to use the taped confession for or why they wanted it.

Asked why he failed to call the attorney to whom his mother had spoken before leaving the house where he had been threatened, defendant replied: "Just because a cop threatens me or my family, I'm supposed to run to a lawyer[?] He'd probably laugh at me."

On redirect examination, defendant explained that when he testified that he did not know whether he killed Chandler, he was flustered; what he meant was that he did not kill her. He related his version of events on the night of Chandler's killing. He saw her walk toward the school with another person, a male. He followed about 12 to 13 houses behind. He did this because the male had something that defendant had to get back because it belonged to somebody else. Defendant followed them onto the school grounds. Defendant was intoxicated by beer and some $200 worth of cocaine. Accordingly, his recollection of events at the school as he testified was "vague." It was also vague when he spoke to the police on June 25.

When defendant entered the school grounds, he stood in a lighted area for two to three minutes and injected cocaine into his arm. He was under the influence of the drug. Afterward he followed the two individuals toward the incinerator. From 25 feet away he saw the male individual "swinging in an upward motion," meaning a thrusting motion. He could not see the target of the thrusts. Then defendant startled the male, who "came up to me, handed me that knife and said, 'Help me.' " That was the knife defendant hid in the wall.

Defendant also interpreted the male's request as a request to help him hide the body. Under the influence of drugs, he helped him drag and hide it. The male went one way and defendant the other. He knew the other man had killed a girl. He didn't notify the police because "where I come from . . . you don't snitch on people." He was uncertain whether he would reveal the man's identity even now, because the jailhouse penalty for informing would be death.

Defendant's memory was as vague on the day of the confession as it was as he testified. He agreed that he stated on tape that he had stabbed a girl at Florence Flanner School, but testified that when he talked to White, he had no memory of actually doing so. Although he had also said on tape that the victim took her clothes off, he testified that he did not remember that event either.

With his own memory uncertain, defendant began to believe Hooker's accusations, even if he did not know the truth of them. The police tricked him into exaggerating his involvement with their spurious offer of a three-year sentence.

On recross-examination, defendant denied killing Chandler. He did not take her to the school grounds. He did not engage in sexual intercourse with her or see anybody else do so. His only involvement was helping hide the

body and not turning in the actual culprit. He did not know if the victim was dead or alive at that time. The actual killer tried to help defendant drag the body, but was in a hurry to leave.

Defendant conceded that the actual killer was never a good friend of his. And he knew that the other man had killed the victim. Why, the prosecutor asked, did he agree to take the knife? "When he handed me the knife, I didn't know anybody was murdered."

Defendant's parents buttressed certain aspects of his contradictory and convoluted story, while calling other details into question. His father, Jim Ochoa, testified that the police came to their house on June 25, 1987, to take defendant to be polygraphed. Although Aquino "conducted himself like a professional" that day, his partner "just blew up." They "made body contact several times. No blows were thrown. . . . He said was going to rip my house apart if my son didn't go, and I told the man— [¶] . . . [¶] . . . 'you're going to find out something different.'" The father talked about getting his son a lawyer, and the partner replied, "What do you need a lawyer for[?] It won't do you no good. All they want is your money."

Jim Ochoa did not see either detective brandish a gun. He weighs two hundred and five to two hundred and ten pounds and is five feet nine inches to five feet nine and one-half inches tall.

When defendant returned with several officers after the polygraph examination his father saw him talking to Velia Ochoa, defendant's mother, and Elva Ochoa, defendant's wife. He could not remember him saying anything about a murder. As they were leaving again, he told his father " 'he tricked me.' "

Defendant's mother testified that after the police came to the house the first time, she hired the attorney, who said he would advise defendant not to take the polygraph test. Defendant told her that the lawyer told him the same thing. When the police arrived, she heard shouting and arguing. The "big one" (presumably Bazzell) told her that " 'if Lester doesn't go, we'll do it the hard way. We'll rip this house apart.' " Aquino, by contrast, "never argued with us." Defendant's mother testified that defendant was also shouting during the argument.

Later that night defendant and the police returned to the house. The prosecutor asked Velia Ochoa whether defendant had told her he had murdered someone, and she replied, "He said he did it."

On rebuttal for the prosecution, Compton testified that he did not discuss any kind of deal with defendant in the polygraph room on June 25. He did

not offer him a fifteen-, nine-, seven-, or three-year sentence in exchange for confessing. White testified that he did not own a nickel-plated .45-caliber automatic handgun. He did not draw a weapon on defendant.

Bazzell testified that he and defendant's father had an argument about whether defendant was adult enough to make his own decision about the polygraph test. But he did not threaten to rip the house apart or threaten anyone. The incident lasted only 10 seconds, when Aquino interceded. He stopped yelling because he could tell that Aquino was upset with him for interfering with the case's investigation.

### The Trial Court's Ruling

The trial court denied defendant's motion to suppress his confession and exclude evidence of the knife. In its ruling, given orally from the bench, the court found "beyond a reasonable doubt that the defendant's statement to the police officers was voluntary. [¶] I'm finding that his taking of the polygraph was voluntary. I'm finding that he was advised of his constitutional rights, that he understood the constitutional rights and that he waived them." The court mentioned that defendant's own testimony established that Hooker told him he did not have to take the polygraph examination.

With regard to the purported offers of lenity in exchange for a confession, the trial court ruled that "that did not occur." It based this ruling on Compton's testimony.

The trial court explicated its conclusion that defendant took the polygraph examination voluntarily. Knowing "of his involvement and . . . that he was a suspect, and . . . that the detectives had a shoe that is rather important evidence, it appears to the court that the defendant was going to make an effort to extricate himself from involvement and that's why he agreed to take the test."

The trial court also ruled that *Miranda* warnings require custody or significant limitations on freedom of action and that defendant was not in custody because he "voluntarily accompanied the police officers to take the polygraph test and [therefore] it wasn't necessary to Mirandize him until [the examination results apparently showed] deceit by the defendant to certain key questions and at that time he was admonished by Detective Hooker."

With regard to the claim that defendant did not understand his right to counsel, the court, quoting Hooker's testimony that defendant said he did not want to speak to a lawyer, but rather to his mother, accepted that testimony

as true, rejected the claim and ruled in sum that he knowingly and intelligently waived his rights to counsel and to silence.

As described *ante*, at page 392, defendant's cognizable contentions are that evidence of his guilt was inadmissible because the police harried him into taking a polygraph examination, failed to read him his *Miranda* rights before giving it, failed to obtain a proper waiver when they did read them to him, and improperly offered him lenity as an inducement to confess. On appeal, defendant renews these contentions, arguing that his confession must be suppressed and the knife excluded from evidence.

■ The prosecution bore the burden of establishing "the voluntariness of defendant's waiver and confession . . . by a preponderance of the evidence." (*People* v. *Whitson* (1998) 17 Cal.4th 229, 248 [70 Cal.Rptr.2d 321, 949 P.2d 18] [discussing *Miranda* claims]; accord, *People* v. *Cahill* (1994) 22 Cal.App.4th 296, 310 [28 Cal.Rptr.2d 1] [discussing improper coercion or inducements].)

*Discussion of Custody Claim*

Defendant agrees that resolving his claim under *Miranda* v. *Arizona*, *supra*, 384 U.S. 436, in his favor requires a conclusion that he was subject to custodial interrogation. He is correct. ■ "In applying *Miranda* . . . one normally begins by asking whether custodial interrogation has taken place. 'The phrase "custodial interrogation" is crucial. The adjective [custodial] encompasses any situation in which "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." ' " (*People* v. *Mayfield* (1997) 14 Cal.4th 668, 732 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "Absent 'custodial interrogation,' *Miranda* simply does not come into play." (*People* v. *Mickey* (1991) 54 Cal.3d 612, 648 [286 Cal.Rptr. 801, 818 P.2d 84].) The test for whether an individual is in custody is "objective . . . : '[was] there a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " (*Thompson* v. *Keohane* (1995) 516 U.S. 99, 112 [116 S.Ct. 457, 465, 133 L.Ed.2d 383]; see also *People* v. *Stansbury* (1995) 9 Cal.4th 824, 830 [38 Cal.Rptr.2d 394, 889 P.2d 588].)

■ We conclude that defendant was not in custody, and therefore need not and do not consider whether he was under interrogation.

■ The question whether defendant was in custody for *Miranda* purposes is a mixed question of law and fact. (*Thompson* v. *Keohane*, *supra*, 516 U.S. at pp. 112-113 [116 S.Ct. at pp. 465-466].) "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the

interrogation and leave. Once the scene is . . . reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry': '[was] there a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citations.] The first inquiry, all agree, is distinctly factual. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination . . . presents a 'mixed question of law and fact' . . . ." (*Ibid.*, fn. omitted.) Accordingly, we apply a deferential substantial evidence standard (*People* v. *Memro* (1995) 11 Cal.4th 786, 826 [47 Cal.Rptr.2d 219, 905 P.2d 1305]) to the trial court's conclusions regarding " 'basic, primary, or historical facts: facts "in the sense of recital of external events and the credibility of their narrators . . . ." ' " (*Thompson* v. *Keohane, supra,* 516 U.S. at p. 110 [116 S.Ct. at p. 464].) Having determined the propriety of the court's findings under that standard, we independently decide whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." (*Id.* at p. 112 [116 S.Ct. at p. 465].)

 It is clear from the foregoing recitation of the testimony of the sheriff's and police detectives that substantial evidence sustains each of the trial court's factual findings. We turn to the question, which we must decide on independent review, whether a reasonable person in defendant's position would have felt free to end the questioning and leave.

In our view, a reasonable person in defendant's position would have realized that he could end the questioning and leave. Most important, defendant signed a statement that told him that the interview was voluntary. It stated: "I, Lester R. Ochoa, do hereby agree to submit myself to an instrumental detection of deception examination. The polygraph examiner in this case is D.R. Hooker. [¶] I am taking this examination freely and voluntarily, and without any promise of reward or immunity, and without any force (mental or physical), or threat of any force. [¶] I clearly understand that I am not required to make any statements relative to this case." A reasonable person in defendant's position, knowing that he or she need say nothing at all, would understand that he or she would do the examiner a favor by offering to leave rather than wasting the examiner's time by sitting mute.

Moreover, the trial court's implicit conclusion that defendant sat unguarded in a public waiting room is incompatible with custody. At oral argument, defendant emphasized that once he was in the examination room he was connected to the polygraph machine and not free to wander about without disconnecting its apparatus from him. But the waiver told him clearly that the interview was voluntary, and the trial court found that he

knew he did not have to take the examination. A reasonable individual knows that he or she can end a voluntary association with other individuals at will. This is so despite the location of defendant's questioning: the fact that he was questioned in the police station's polygraph examination room does not necessarily require a finding of custody, even if the room was in a secure area. (*People* v. *Stansbury*, *supra*, 9 Cal.4th at pp. 833-834.)

At oral argument, defendant also asserted that the similar facts of *People* v. *Aguilera* (1996) 51 Cal.App.4th 1151 [59 Cal.Rptr.2d 587], in which the court reversed a conviction on grounds of a *Miranda* violation, require the same result here. We do not agree. There are factual similarities. But in *Aguilera*, the court found that a reasonable individual would experience a degree of restraint "normally associated with a formal arrest" (*id.* at p. 1161) in part because the police, as the court emphasized with italics, told the defendant that " '[w]*e're not gonna let you leave* here until we go talk to the girl, and she's not gonna be able to confirm the story . . . .' " (*Id.* at p. 1160; see *id.* at p. 1163). Nor does *Aguilera* say that the defendant in that case was given and signed a formal advisement that the questioning was voluntary—rather, an officer merely informed him that he was not in custody (*id.* at pp. 1159, 1163). Without either approving or disapproving *Aguilera*'s compilation of circumstances that in its view tend to prove or disprove custody (*id.* at p. 1162), we find certain facts in that case notably unlike the facts of this one.

### *Discussion of Other Confession-related Claims*

We turn to defendant's claims that he did not confess voluntarily and that he did not understand his right to counsel.

■ "What the Constitution permits to be admitted in evidence is 'the product of an essentially free and unconstrained choice . . .' to confess. [Citations.] The question is whether defendant's choice to confess was not 'essentially free' because his will was overborne. . . . [¶] The police testified that defendant was not threatened, was offered no inducement, and [understood] his rights to counsel . . . . The court believed the testimony of the police . . . . We must accept its evaluation of the facts when substantial evidence supports it, as the testimony does. [Citation.] Doing so, independently resolving the legal question whether the confession was voluntary is a simple task: it was." (*People* v. *Memro*, *supra*, 11 Cal.4th at p. 827.) That is also true of the waiver claim: defendant understood his right to counsel and waived it. In sum, each of defendant's remaining contentions is without merit.

*Corpus Delicti*

Defendant contends that the prosecution did not establish the corpus delicti of the special circumstances of rape and kidnapping Chandler, and hence the jury was not entitled to hear his confession to the crimes. We disagree: the corpus delicti was established.

In the middle of trial, but before the jury heard defendant's taped confession, the court heard argument in the jury's absence on whether the corpus delicti of Chandler's rape and kidnapping had been established by testimony given so far.

The court found "that there is a corpus [delicti] as to rape and kidnapping.

"As to the rape, . . . that the sweat shirt is inside out, that the pants are on backward is an indication that at sometime the body was disrobed and that it was covered on again." The court also referred to the presence of semen and the "ample evidence of force and violence."

With regard to kidnapping, the court took note of the testimony that Chandler loved her boyfriend and was not likely to go willingly with someone else for a sexual purpose. It also mentioned the bag of sugar found beside the car and the evidence of violence at the crime scene. "All of this indicates . . . that the victim was taken against her will . . . ."

As we will explain, the court's rulings were sound.

Because Chandler was killed before the enactment of Penal Code section 190.41—all unlabeled statutory references are to this code—the law required the prosecution to prove the corpus delicti of the special circumstances of rape and kidnapping. (*People* v. *Zapien* (1993) 4 Cal.4th 929, 985, fn. 7 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

■ The law of corpus delicti contains "two distinct, though related, concepts . . . . First, the *corpus delicti* is a necessary element of the prosecution's case in a criminal trial . . . . Thus, a precondition to conviction is that the state prove that a 'crime' has been committed—otherwise there could not possibly be guilt, either in the accused or in anyone else. [¶] The second concept is closely related to the first. The 'corpus delicti rule' prohibits the prosecutor from establishing the *corpus delicti* . . . through the use of the extrajudicial statements of the defendant. [Citations.] Thus the state must prove the *corpus delicti* independently of the accused's out-of-court declarations. The rule further provides that once the *corpus delicti* has

been proved by such evidence *aliunde*, the extrajudicial statements then become admissible to determine the defendant's connection with the crime." (Comment, *California's Corpus Delicti Rule: The Case for Review and Clarification* (1973) 20 UCLA L.Rev. 1055, fn. 1.) A defendant cannot be held to answer a criminal complaint following a preliminary examination unless the magistrate is satisfied that the corpus delicti has been established. (§§ 859b, 871, 872.)

"The purpose of the corpus delicti rule is to assure that 'the accused is not admitting to a crime that never occurred.'" (*People* v. *Jones* (1998) 17 Cal.4th 279, 301 [70 Cal.Rptr.2d 793, 949 P.2d 890].) Hence, before a confession may be introduced " 'slight corroborating facts' " (*People* v. *Jones* (1867) 31 Cal. 565, 569) must show independently "that a crime has been committed by someone" (*People* v. *Cobb* (1955) 45 Cal.2d 158, 161 [287 P.2d 752]).

Significant here, "the prosecution need not eliminate all inferences tending to show a noncriminal cause of [the harm]. Rather, the foundation may be laid by the introduction of evidence which creates a reasonable inference that the [harm] could have been caused by a criminal agency [citation], even in the presence of an equally plausible noncriminal explanation of the event." (*People* v. *Jacobson* (1965) 63 Cal.2d 319, 327 [46 Cal.Rptr. 515, 405 P.2d 555].)

### Corpus Delicti of Chandler's Rape

■ Defendant argues that the prosecution failed to establish the corpus delicti of Chandler's rape because (1) the semen found on her body was entirely explainable by sexual relations with her boyfriend Alvarado on the night of the killing, and (2) the fact that her sweatshirt was on inside out and her pants backwards could have resulted from dressing in haste to take Alvarado to work just before she was killed. We do not agree.

"No universal and unvariable rule can be laid down in regard to the proof of the corpus delicti. Each case depends upon its own peculiar circumstances." (*State* v. *Williams* (1905) 46 Or. 287, 297 [80 P. 655, 660]; accord, *Keyes* v. *State* (1964) 236 Md. 74, 78 [202 A.2d 582, 583-584]; *Desilvey* v. *State* (1943) 245 Ala. 163, 165 [16 So.2d 183, 184]; *People* v. *Schneider* (1935) 360 Ill. 43, 51 [195 N.E. 430, 433].) But *People* v. *Jennings* (1991) 53 Cal.3d 334 [279 Cal.Rptr. 780, 807 P.2d 1009] is a model that, with allowance made for somewhat different facts, applies here.

In *Jennings*, the victim's body "was found in an irrigation canal in a rural area. She was unclothed, and although forensic examination detected she had

suffered a broken jaw, the advanced decomposition of her body made determining whether she had been sexually assaulted impossible." (*People* v. *Jones, supra,* 17 Cal.4th at pp. 302-303.) Still we found that the trial court properly admitted evidence of the defendant's extrajudicial statement that he had raped the victim before killing her. "Although we characterized the independent evidence of rape as ' "thin" ' (*People* v. *Jennings, supra,* 53 Cal.3d at p. 369), we nevertheless concluded that the unclothed condition of the victim's body, its location when found, and the evidence of a broken jaw,. considered together, were sufficient to establish the corpus delicti of rape." (*Id.* at p. 303.)

In this case, Alvarado testified that when he last saw Chandler—i.e., as she drove him to work—she was wearing her sweatshirt in an orthodox fashion. He also testified that she was clean and unmarked by evidence of trauma. (*Ante,* at p. 389.) When found, the state of her clothing and hygiene suggested that she had been brutalized. By analogy to *Jennings,* that evidence suffices to satisfy the corpus delicti—i.e., to establish the trustworthiness of defendant's confession that he raped her.

We need not rely on the evidence of semen to reach the foregoing conclusion. It could be argued that because identity forms no part of the corpus delicti, the fact that the semen could not be established as defendant's is immaterial. On the other hand, the serologist testified that all of the semen found with Chandler's body could have come from consensual sexual relations with her boyfriend Alvarado (*ante,* at p. 389), and it could be argued that it would be unfair under the state of the evidence to rely on the presence of semen to establish the corpus delicti. There is no need to do so, however; the nonserological evidence of rape sufficed to meet the corpus delicti requirement.

### Corpus Delicti of Chandler's Kidnapping

█ Likewise, the evidence sufficed to satisfy the corpus delicti of kidnapping. Chandler was found, some distance away from her home, in a schoolyard with evidence of trauma. She was shoeless; her socks were thick with leaves and burrs. This was at least slight evidence (*People* v. *Jones, supra,* 17 Cal.4th at p. 301) to show that she did not accompany defendant willingly—it would be unusual for someone to agree to accompany another to a location in the dark without shoes that she could easily obtain inside her house. Second, Chandler's housemates found an unopened bag of sugar beside the locked car. Alvarado had asked her to buy sugar when she dropped him off at work. Of course, it is conceivable that she could have simply left the bag of the sugar by the car, rather than taking it in the house

or replacing it in the car, and gone with defendant willingly to the place she was killed—just as it is conceivable that she did not mind walking through burrs and leaves in her socks. But as stated, "the prosecution need not eliminate all inferences tending to show a noncriminal cause of [the harm]." (*People* v. *Jacobson*, *supra*, 63 Cal.2d at p. 327.) The corpus delicti may be established "even in the presence of an equally plausible noncriminal explanation of the event." (*Ibid.*) It is at least equally plausible that Chandler dropped the sugar and unwillingly went with defendant when he accosted her and forcibly took her, shoeless, to the schoolyard.

*Failing to Appoint Arthur Lindars as Second Defense Counsel*

Defendant contends that the court erred in denying his motion to appoint or not to remove Arthur Lindars as a second attorney to represent him (see *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 434 [180 Cal.Rptr. 489, 640 P.2d 108]). He argues that Lindars, the husband of his counsel, Mary Lynn Huston, had established an attorney-client relationship with him and that the court violated his right to the effective assistance of counsel when it did not permit Lindars to represent him at trial.

The court (for this hearing Judge Robert Martinez; the case was tried before Judge Alfonso M. Bazan) held a hearing on the matter before trial. Huston testified that Judge Thomas F. Nuss ordered *Keenan* counsel appointed and mentioned in chambers that he would appoint Lindars to that role, but that she could find nothing in the court's records or her own ordering Lindars's appointment. Judge Nuss testified that he did not recall the motion for *Keenan* counsel, which defendant contended resulted in Lindars's appointment on October 16, 1987. Counsel argued that Lindars had done "a great deal of work in this case. He has reviewed everything in the file, on top of which we have discussed our trial strategy at length and made plans for it."

The court ruled that no *Keenan* counsel had been designated and that such designation remained to be done. It rejected Lindars's appointment for two reasons: its fear that a husband-and-wife team might create a perception of impropriety among members of the public, who might wonder if they were billing conversations over meals to them; and its concern that "this case is presently set on a date that can potentially conflict with the Snoke case"— i.e., People v. Snoke, apparently a criminal case also involving special circumstance allegations. It ordered Huston to submit the names of seven attorneys that would be acceptable cocounsel to her. Counsel called the court's first stated reason for rejecting Lindars's appointment an "affront."

On January 21, 1988, the court appointed David J. Daugherty as defendant's second counsel.

■ The decision to appoint *Keenan* counsel is reviewed for abuse of discretion. (*People* v. *Wright* (1990) 52 Cal.3d 367, 411 [276 Cal.Rptr. 731, 802 P.2d 221].) The decision whom to appoint to that role must also be reviewed for abuse of discretion. Moreover, we review the court's ruling that no *Keenan* counsel was ever appointed on a deferential substantial evidence standard: the inquiry is of a factual nature. (See *Alexander* v. *Superior Court* (1994) 22 Cal.App.4th 901, 918 [27 Cal.Rptr.2d 732]-919.)

■ Substantial evidence supported the ruling that no appointment was ever made. Hence the question before us is not whether the court erred in relieving Lindars, but whether it abused its discretion in refusing to appoint him in the first place. It did not. We will defer to the trial court's second stated reason for refusing to appoint Lindars—the possibility of a conflict with the Snoke case. We note, too, that there is no evidence in this record that an attorney-client relationship was ever established. At most, Lindars made himself familiar with the case and discussed strategy with Huston. Defendant may not even have been aware of these efforts at the time they were made, much less of an attorney-client relationship with Lindars.

### Denying Motion to Sever Counts

In case No. A885934, defendant was charged with crimes against Chandler. In case No. A886206, he was charged with crimes against Charlotte J. and Yolanda A. The prosecution moved to consolidate the two cases. Defendant moved in turn to sever the counts charging crimes against Yolanda A. from those charging crimes against Charlotte J. in case No. A886206. The court granted the prosecution's motion and thereby implicitly denied defendant's.

Defendant now contends that the court committed error under state law.

■ We review the court's rulings, explicit and implicit, for abuse of discretion. (See *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1284 [18 Cal.Rptr.2d 796, 850 P.2d 1].) A court abuses its discretion when its rulings fall "outside the bounds of reason." (*People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) These did not do so.

The governing statute is section 954, which provides in relevant part: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. . . ."

■ "Consolidation usually promotes efficiency, and this case was no exception. Consolidation obviated the need to select an additional jury

. . . ." (*People* v. *Mason* (1991) 52 Cal.3d 909, 935 [277 Cal.Rptr. 166, 802 P.2d 950].) Because consolidation ordinarily promotes efficiency, the law prefers it. "Joinder of related charges, whether in a single accusatory pleading or by consolidation of several accusatory pleadings, ordinarily avoids needless harassment of the defendant and the waste of public funds which may result if the same general facts were to be tried in two or more separate trials [citation], and in several respects separate trials would result in the same factual issues being presented in both trials." (*People* v. *Brock* (1967) 66 Cal.2d 645, 655 [58 Cal.Rptr. 321, 426 P.2d 889].)[2] Thus "[a] defendant can prevent consolidation of properly joined charges only with a 'clear showing of prejudice' . . . ." (*People* v. *Mason, supra*, 52 Cal.3d at p. 935.)

"[T]he propriety of a ruling on a motion to sever counts is judged by the information available to the court at the time the motion is heard." (*People* v. *Cummings, supra*, 4 Cal.4th at p. 1284.) The same is true of a motion to consolidate. (See *People* v. *McClain* (1942) 55 Cal.App.2d 399, 402 [130 P.2d 978].) ▮ The requirements for joinder were met here because the information available at the time was that each individual was a victim of the same class of crimes—sexually assaultive conduct (see *People* v. *Rhoden* (1972) 6 Cal.3d 519, 524 [99 Cal.Rptr. 751, 492 P.2d 1143]-525)—facilitated by means of a knife (see *People* v. *Hawkins* (1995) 10 Cal.4th 920, 941 [42 Cal.Rptr.2d 636, 897 P.2d 574]), and with the intent to kill (*People* v. *Miller* (1990) 50 Cal.3d 954, 988 [269 Cal.Rptr. 492, 790 P.2d 1289]). " 'Since the requirements for joinder were satisfied, defendant can predicate error only on a clear showing of potential prejudice.' " (*People* v. *Osband* (1996) 13 Cal.4th 622, 666 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

There is no question that evidence of each set of crimes would have been admissible in trying each other set to show both intent and plan. (Evid. Code, § 1101, subd. (b).) Hence any inference of prejudice was dispelled. The court did not abuse its discretion in granting the prosecution's motion to consolidate and implicitly denying defendant's motion to sever.

▮ Finally, "[e]ven if the ruling was correct when made, we must reverse if defendant shows that joinder actually resulted in 'gross unfairness,' amounting to a denial of due process." (*People* v. *Arias* (1996) 13 Cal.4th 92, 127 [51 Cal.Rptr.2d 770, 913 P.2d 980].) ▮ No gross unfairness occurred. All of the charges were quite inflammatory in nature. Though the murder case was buttressed by defendant's confession, the crimes against Charlotte J. and Yolanda A. were proved by strong evidence.

---

[2]*Brock* was overruled on another point by *People* v. *Cook* (1983) 33 Cal.3d 400, 413, footnote 13 [189 Cal.Rptr. 159, 658 P.2d 86]. *Cook* in turn was overruled by *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 765-770 [230 Cal.Rptr. 667, 726 P.2d 113].

And as explained, the evidence of each set of crimes was cross-admissible to show intent and plan. No due process violation occurred.

■■■ Because the evidence was cross-admissible to show intent, we also reject defendant's contention that the court erred by failing to instruct the jury, on its own motion, that it should not consider evidence of the assault on Yolanda A. for any other purpose, including propensity for violence (see Evid. Code, § 1101, subds. (a), (b)).

Defendant correctly notes that the trial court ordered the prosecution not to urge the jury to consider evidence of the attack on Yolanda A. for any other purpose:

"MR. HEARNSBERGER [the prosecutor]: Well, I think you're telling me that I cannot argue from the [Yolanda A.] attack that the jury can use that in any way with regard to the defendant's intent or any other type of—

"THE COURT: That's correct.

"MR. HEARNSBERGER: —[Evidence Code section] 1101(b) type argument—

"THE COURT: That's correct.

"MR. HEARNSBERGER: —toward the Chandler or—

"THE COURT: That's correct.

"MR. HEARNSBERGER: I disagree with the court's ruling and I'd like to be heard in that regard, but I don't need to be right now.

"THE COURT: That's fine."

Though the record shows that the court supervised the trial of this case with extraordinary competence and diligence, we agree with the People that this ruling was erroneous. As we have explained, evidence of each assault could be used under Evidence Code section 1101, subdivision (b), to show defendant's mental state for each other assault, namely his intent. The prosecution introduced evidence that he intended to kill Charlotte J. and would have done so had Ramage not interceded; that he intended to kill Yolanda A. and would have done so had Faviola Ambriz not interceded; and that he intended to and did kill Chandler. The jury rejected the prosecution's contention that he intended to kill Yolanda A., but it was a tenable theory for which evidence was cross-admissible under subdivision (b) of Evidence

Code section 1101. The court's tentative ruling was erroneous. Because defendant's contention that the court should have instructed the jury not to consider the Yolanda A. evidence for any other purpose is predicated on a ruling to which he was not entitled, his contention does not withstand scrutiny. And if he is arguing that the court had a sua sponte duty at least to instruct the jury not to consider evidence of each attack as improper character evidence, we disagree: "in general, the trial court is under no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct." (*People* v. *Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776], fn. omitted.)

### *Propriety of Eyewitness's Pretrial Identification of Defendant*

 Defendant contends that the state denied him due process of law under the Fourteenth Amendment to the United States Constitution and article I, section 15, of the California Constitution (hereafter the due process clauses) when the police showed Charlotte J., the victim of the rape that defendant was suspected of committing about six months before the murder, a single photograph of him in profile following a pretrial photographic lineup containing six pictures. We cannot agree.

Defendant filed a motion seeking to exclude Charlotte J.'s identification of him in court. He contended in effect that allowing her to do so would violate the due process clauses. The court held an *in limine* hearing on the matter.

At the hearing, Charlotte J. testified that she is nearsighted. She was walking to her apartment when someone grabbed her from behind, knocking her glasses off as he covered her eyes. Nonetheless, as he was taking her to another location she "got a good look at . . . his side profile" before he shoved her head down. Later she would have nightmares containing an image of that profile. She could not describe her assailant in words to a police officer after the attack; she was "blocking everything out" and would have to see him to describe him. "I knew I could pick them out. I knew if I saw them again on the street I could picture that. But to describe somebody" was difficult; she was reluctant to do it. She told a police officer that the assailant was five feet six inches tall, thin, and weighed one hundred thirty pounds, whereas defendant is five feet eleven inches tall and weighs one hundred fifty-five pounds. Later a second assailant, Ramage, joined them and the first man had him blindfold her. Ramage is five feet five inches tall and weighs one hundred forty-five pounds.

Aquino contacted her shortly after the murder, explaining that a similar crime had occurred at the same location. After having her read and sign a

caution that the photographs he was about to show her might not contain any suspect in her case, he showed her two cards containing photographs. She "recognized instantly" Ramage's likeness in one set of photographs. Viewing defendant in another set of six photographs, she identified him less than positively, telling Aquino that he "looked familiar, but I needed a side profile." She "didn't want any doubt to be there in my mind at all . . . ." Aquino, who happened to have a photographic profile of defendant from the investigation but none of any other lineup participant, showed it to her (with some reluctance, as he was concerned about the legal implications), and asked her if the subject looked familiar. He told her it was the only profile he had, but that this fact should not influence her. Seeing it, Charlotte J. recognized defendant, "broke down" and felt physically ill and scared. At the hearing she insisted that the profile "was [of] him. It is him. I don't know what to say [¶] . . . [¶] to convince you [the trial court] that it is him. [¶] . . . [¶] Not only did I recognize him, but . . . it brought something out, too, you know. I hid it back inside and I didn't want to remember it. And afterwards, it just clicked." She further testified that "[o]nce I saw the side profile, I had no doubt whatsoever."

Later Charlotte J. identified defendant in a physical lineup, although at the time she had trouble identifying him as the first or second rapist. She based this identification on the incident, not on the photographs she had already seen.

The trial court denied the motion. As relevant here, it ruled that showing Charlotte J. a profile solely of defendant, though not the ideal procedure, was not "unnecessarily suggestive." As stated, she identified defendant to the jury as the man who abducted and raped her.

■ Defendant bore the burden of showing an unreliable identification procedure. (*People* v. *DeSantis, supra,* 2 Cal.4th at p. 1222.) "The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation]. If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable." (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1242 [270 Cal.Rptr. 451, 792 P.2d 251].) In other words, "[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends." (*United States* v. *Bagley* (9th Cir. 1985) 772 F.2d 482, 492.)

 Defendant argues that standards of constitutional reliability required Aquino to show Charlotte J. photographs of the profiles of all six men in the photographic lineup. But he does not persuade us that he met his burden of showing an unduly suggestive identification procedure. The standard of review for a claim of undue suggestiveness remains unsettled, as it was when we decided *People* v. *Gordon, supra,* 50 Cal.3d 1223. (See *id.* at pp. 1242-1243.) As recently as *People* v. *Carpenter* (1997) 15 Cal.4th 312, 367 [63 Cal.Rptr.2d 1, 935 P.2d 708], we declined to specify a standard of review. But even under independent review, the record is clear that it was not unduly prejudicial. Thus, there is no need to consider reliability under the totality of the circumstances listed in the previous paragraph.

To begin with, "[t]he 'single person showup' is not inherently unfair." (*People* v. *Floyd* (1970) 1 Cal.3d 694, 714 [83 Cal.Rptr. 608, 464 P.2d 64].)[3] More important yet as it relates to this case: for a witness identification procedure to violate the due process clauses, the state must, at the threshold, improperly suggest something to the witness—i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure. Due process does not forbid the state to provide useful further information in response to a witness's request, for the state is not suggesting anything. This point was established in California in *People* v. *Slutts* (1968) 259 Cal.App.2d 886 [66 Cal.Rptr. 862]. "A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police." (*Id.* at p. 891.)

In sum, we are not persuaded that the due process clauses were violated. The court did not err in denying defendant's motion.[4]

*Sufficiency of Evidence of the Special Circumstances*

 Defendant contends that there was insufficient evidence to find true the special circumstance allegations, so that doing so violated the due process clauses. In reviewing a claim that there was insufficient evidence of the special circumstances to find them true, " 'we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any

---

[3]*Floyd* was overruled on another point by *People* v. *Wheeler* (1978) 22 Cal.3d 258, 287, footnote 36 [148 Cal.Rptr. 890, 583 P.2d 748].

[4]It is noteworthy, moreover, that the court instructed the jury to consider, in evaluating the accuracy of Charlotte J.'s identification, whether allowing her "to see a profile photograph of the Defendant without also showing her profiles of the other persons in the photographic lineup was an unduly suggestive procedure that led to an erroneous identification of the Defendant," and "[w]hether the subsequent identifications by Charlotte [J.] . . . were based on an erroneous photographic identification or whether they were based on her observation of the perpetrator which she has identified as the Defendant." (See the discussion of the controversy over this language *post,* at pp. 424-426.)

rational trier of fact could have found the essential elements of the [allegations] beyond a reasonable doubt." ' " (*People* v. *Osband*, *supra*, 13 Cal.4th at p. 690, italics deleted, bracketed word added here.)

There is no doubt that the prosecution presented sufficient evidence. A rational trier of fact could conclude from defendant's confession alone that he kidnapped, raped, and murdered Chandler. He furnished the police with the details of each offense. Physical evidence found at the crime scene provided yet additional proof of the offenses. We have listened to defendant's taped statement. Contrary to his contention that it was vague and that he verged on incoherence, we find that he sounded calm, composed and lucid as he spoke in a monotone. There was no violation of the due process clauses.

### Failing to Establish Scientific Reliability of Blood Tests

As stated, a serologist testified that a knife and false fingernails tested presumptively positive for blood. (*Ante*, at pp. 389-390.) Defendant did not object. He now contends that "no evidentiary foundation whatsoever was laid for the admission of the results of the presumptive blood test, nor was even the type of blood test being used ever identified in the trial record. Similarly, no foundation was admitted that the tests used . . . were accepted as reliable." He appears to claim that these lapses violated the state law requirement that the reliability of the tests be established in various respects before this forensic evidence could be admitted. (*People* v. *Leahy* (1994) 8 Cal.4th 587, 594, 604 [34 Cal.Rptr.2d 663, 882 P.2d 321], discussing *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240], and *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145].)

Having failed to object on *Kelly/Frye* grounds to the admission of the evidence, however, defendant has not preserved his claim. (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 688 [276 Cal.Rptr. 788, 802 P.2d 278].)

█ Defendant asserts that if we reject his claim on that basis, his counsel's failure to object constituted ineffective assistance of counsel. We disagree. A defendant claiming ineffective assistance of counsel under the federal or state Constitution must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839].) Defendant is unable to show that counsel's performance resulted in prejudice to him. As stated, the blood evidence was inconclusive; the jury could not have given it

much weight. Its evidentiary significance paled by comparison to defendant's confession—there is no reasonable probability of a different outcome.

### Showing Alvarado Postmortem Photographs of Chandler

The trial court permitted the prosecution to show Juan Carlos Alvarado postmortem photographs of Lacy Chandler, his girlfriend, over defendant's objection that this procedure was unduly prejudicial (Evid. Code, § 352). Defendant had argued unsuccessfully that Alvarado had already shown distress on the witness stand and that showing him the photographs would induce more visible distress and inflame the jury. The prosecutor said he needed to show Alvarado the photos for corpus delicti purposes—specifically, to establish that when he last saw her, just before defendant abducted her, that she was not in the disheveled state in which she was found. (See *ante*, at p. 389.) He pointed out that defendant was challenging the corpus delicti of the rape special circumstance, a challenge that was pending, and that the evidence already introduced was of little help in establishing the corpus delicti. He also argued that the photographs were relevant to the question of intent to kill. In response, defendant argued that Alvarado had already testified that Chandler was clean and free of signs of trauma when he last saw her.

The court ruled that it had weighed the probative value of the photographs against their prejudicial effect and that the prosecution could show Alvarado four of them. The prosecution elected to show him three: exhibits numbered 37, 38, and 39. All were postmortem photographs of Chandler. The prosecution asked the court to agree, with regard to exhibit No. 37, that "I'm only showing the . . . portion of the photograph showing a sweat shirt and an emblem on it," and the court did so.

Defendant contends that the court erred under state law and violated the due process clauses by overruling his objection to showing Alvarado the photographs.

We review a ruling denying a motion to exclude photographic evidence on grounds of undue prejudice or cumulativeness for abuse of discretion. (*People* v. *Memro*, *supra*, 11 Cal.4th at pp. 866-867.) There was none: the court's rulings fell within the bounds of reason. We have reviewed the photographs and, although we believe an average member of the community would find them quite disturbing, and there can be little doubt that Alvarado found them so when he saw them, they are neither unduly prejudicial nor cumulative. They tended to prove the mental state and physical act elements of the crimes charged (see *id.* at pp. 865-866) and the special circumstance

allegations—needed proof not only for the jury but also for the trial court in light of defendant's pending corpus delicti challenge.

There was no violation of state law. Neither was there any due process violation—the procedure did not make the trial fundamentally unfair.

### Failing to Grant Continuance Despite Medical Complaint

The cause was called for trial on July 26, 1988. On that day, defendant moved for a continuance on grounds that "some residual problems from the injuries" apparently suffered in a fight were interfering with his ability to assist in his defense. The trial court (Judge Theodore Piatt) provisionally denied that motion, saying that it did not have the proper medical records and that Judge Bazan should resolve the issue.

On July 29, defendant moved for a continuance before Judge Bazan on a different medical basis: that he wanted to resume taking medication to control itchy hives and continue doing so until cured, although doing so would interfere with his ability to assist in his defense. He did not mention any injuries. The court reviewed some medical records and denied the motion, saying that it would try to obtain relief for defendant through external lotions but that "it's not going to serve any useful purpose for him to start taking medicine orally that's going to affect his ability to cooperate with counsel. It would seem to me that as between thinking clearly and cooperating with counsel and some minor discomfort as a result of hives, it's in his best interests to be able to think clearly and cooperate with counsel."

Defendant contends that denying the continuance motion violated state law and his rights under the United States and California Constitutions. We do not agree. There was no abuse of discretion (*People* v. *Hawkins*, *supra*, 10 Cal.4th at p. 945). The court determined that defendant could tolerate some minor discomfort and proceed with trial. It also implicitly determined that the minor physical detriment to him was outweighed by the need to move forward with the proceedings. There was no violation of state law or of any constitutional guaranty.

### Failing to Dismiss Juror Who Saw Defendant in Shackles

Defendant apparently contends that the court erred in failing to dismiss on its own motion a juror who saw him in shackles. On learning that she had, he moved for a mistrial or to replace the juror, both of which motions the court denied. Defendant contends that the court's failure to grant either of the motions violated state law.

There was no abuse of discretion (*People* v. *Williams* (1997) 16 Cal.4th 153, 251 [66 Cal.Rptr.2d 123, 940 P.2d 710] [mistrial]; *People* v. *Holt* (1997) 15 Cal.4th 619, 659 [63 Cal.Rptr.2d 782, 937 P.2d 213] [decision not to excuse seated juror]). The court questioned the juror, who glimpsed defendant in chains outside the courthouse, and received her assurance that the encounter would not prejudice her and that she would not mention it to other jurors. Nothing more was required. ▪▪▪ "Prejudicial error does not occur simply because the defendant 'was seen in shackles for only a brief period either inside or outside the courtroom by one or more jurors or veniremen.'" (*People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 584 [15 Cal.Rptr.2d 382, 842 P.2d 1142], affd. *sub nom. Tuilaepa* v. *California* (1994) 512 U.S. 967 [114 S.Ct. 2630, 129 L.Ed.2d 750].)

*Failing to Preserve Photographic Evidence of Charlotte J. Crime Scene*

Defendant contends that his conviction on the counts relating to Charlotte J. was obtained in violation of the due process clause of the Fourteenth Amendment to the United States Constitution. He moved to dismiss the counts as a sanction on the basis that the police negligently lost photographic shoe print evidence from the scene of the attack on Charlotte J. The court held a hearing and denied the motion.

▪▪▪ "'[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" (*People* v. *Hines* (1997) 15 Cal.4th 997, 1042 [64 Cal.Rptr.2d 594, 938 P.2d 388]; cf. *People* v. *Beeler* (1995) 9 Cal.4th 953, 976 [39 Cal.Rptr.2d 607, 891 P.2d 153].)

In this case, there was no bad faith claim at all, but only one of negligence. Thus failing to preserve potentially useful evidence does not deny due process of law. Moreover, the hearing on the motion failed to show even that the evidence was potentially useful for exculpation. An investigating police officer who used to be a shoe salesman took two photographs of shoe prints. He described the impressions as "really very faint"; the most he could tell was that they appeared to be of two different types, of adult size, and to have been made by tennis shoes. He could not discern an identifiable pattern for the length of the shoe, but only that one had a circle in the ball of the foot. He did not see the photographs that purportedly were later lost.

A different officer, Aquino, testified that he did see one of the photographs and that "[t]here wasn't anything in [it] that I could say was a pattern. It just looked like a flat indentation into the dirt."

By contrast, Officer Joseph Cowan testified for the prosecution that the shoe print pattern he saw at the Charlotte J. crime scene "very" closely

resembled the print seen in a photograph taken from the Chandler murder scene.

The court ruled that the shoe print evidence either had no value at all or, if Cowan's version of events was accepted, was inculpatory. It denied the motion to dismiss the Charlotte J.-related counts and ruled that there was no due process violation. We agree.

### Refusing to Entertain an Alternate Juror's Question

Defendant may be understood to contend that the trial court violated his right to a jury trial when it refused to answer questions posed by an alternate juror, Barbara C., during a recess. The exchange took place after all jurors except the alternate and one other, a regular member of the jury, had left the courtroom.

At the outset of trial the court told the jurors that it would not entertain questions during the presentation of evidence. Nevertheless, the alternate juror, saying she "didn't want to interrogate the witness but just [had] a question," asked a question about the facts of the case. The court did not direct that her question be answered. It told her that during deliberations she could ask for the record to be read back.

The court did not err. by refusing to direct that Barbara C.'s question be answered. ■■■ The court "has discretion to ask questions submitted by jurors or to pass those questions on and leave to the discretion of counsel whether to ask the questions." (*People* v. *Cummings, supra,* 4 Cal.4th at p. 1305.) Defendant was not denied his right to a jury trial.

### Failing to Remove Purportedly Sleeping Juror

■■■ Defendant contends that the court deprived him of his right to a fair trial when it failed to conduct an adequate inquiry into the conduct of a juror, Lyle V., who defendant asserts "on at least two occasions . . . was sleeping during testimony . . . ." To the contrary, the record reflects that on each occasion to which defendant refers the court noticed Lyle V.'s possible drowsiness and inquired whether he had been paying attention to the proceedings. Lyle V. said that he had and proved it to the court's and counsel's satisfaction by describing his reaction to the testimony.

Defendant was not deprived of his right to a fair trial. The court conducted an inquiry into Lyle V.'s attentiveness and satisfied itself and counsel that he was alert. Nothing more was required. (See *People* v. *DeSantis, supra,* 2 Cal.4th at pp. 1233-1234.)

*Ruling That Question Directed to Ramage Sought Irrelevant Evidence*

Defendant asked Edward Ramage on cross-examination for the name of his regular cocaine supplier. Ramage had just exhibited discomfort at disclosing the names of persons with whom he traded in drugs. The prosecution objected on grounds of relevance, and the court sustained the objection.

■ Defendant contends that by sustaining the prosecution's objection regarding the name of Ramage's regular cocaine supplier, the court erred under state law. (Evid. Code, §§ 210, 351.) We disagree. The court did not abuse its discretion (*People* v. *Champion* (1995) 9 Cal.4th 879, 922 [39 Cal.Rptr.2d 547, 891 P.2d 93]) in excluding the evidence as irrelevant. Though defendant may be correct that evidence of Ramage's drug use was relevant to impeach his credibility, Ramage admitted such use, and the question did not directly address that topic. The court did not err.

*Purportedly Failing to Instruct on the Intent to Kill*

■ Defendant contends that the trial court erroneously failed to instruct that to find true the felony-murder special circumstances the jury must also find that he had the intent to kill. He contends that the deficiency in the instructions given violated his federal and state constitutional rights to due process and to a jury trial, and against punishment under an ex post facto law. He is incorrect.

As mentioned, defendant was charged with two felony-murder special circumstances: rape and kidnapping. "In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we held that intent to kill was a necessary element of the felony-murder special circumstance . . . . We overruled . . . *Carlos* . . . in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]. As to offenses committed after *Carlos* but before *Anderson*, however, due process and ex post facto principles demand that the intent-to-kill requirement apply to any felony-murder special circumstance charged in connection with such offenses." (*People* v. *Johnson* (1993) 6 Cal.4th 1, 44 [23 Cal.Rptr.2d 593, 859 P.2d 673].) The information alleged that defendant murdered Chandler on or about June 18, 1987, which happened to be during the "window period" between *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], and *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306].

The trial court and counsel, unsure about the applicability of *Anderson*, decided to hedge. Accordingly, the court instructed the jury in terms of the

special circumstances without requiring, in those instructions, a finding of intent to kill. Instead, the court added to each special circumstance instruction the following requirement: "If you find the special circumstance true, you must make a separate finding as to whether the defendant intended to kill a human being at the time of the murder. A special form will be provided for that purpose." The jury was given a verdict form that read, for each special circumstance: "We further find that in the commission of murder while engaged in the commission of [rape and kidnapping] that the defendant (insert 'did' or 'did not') intend to kill Lacy Corrin Chandler." The signed and filed form shows, for each special circumstance, "did" written where the form instructed "did" or "did not" to be inserted.

If error occurred in the foregoing procedure, it was harmless, for the jury found that defendant intended to kill. We so decided in *People* v. *Wader* (1993) 5 Cal.4th 610, 642 [20 Cal.Rptr.2d 788, 854 P.2d 80]. We decline to reconsider our view.

 In a related claim, defendant also contends that the verdict form failed to inform the jury that it must find beyond a reasonable doubt that he intended to kill to find true each special circumstance.

The special circumstance verdict form asked for a finding that in committing the acts giving rise to the two special-circumstance allegations defendant intended to kill. Prior to this language, the form asked the jury to find true or not true each special circumstance beyond a reasonable doubt.

Any error that occurred was harmless. As stated, the jurors were instructed that they must find each special circumstance established beyond a reasonable doubt before they could find it true. They were also told that "[i]f you have a reasonable doubt as to whether a special circumstance is true, it is your duty to find that it is not true." The verdict form asked if each special circumstance was true, and immediately after, with no interruption except a paragraph break, asked whether in doing the act constituting a special circumstance defendant intended to kill. The jury could only have understood the burden of proof to apply to the question of intent to kill. The claim is without merit.

Finally, defendant contends that the instructions failed to explain to the jury its duty to consider voluntary intoxication in determining whether he had the intent to kill. As we explain immediately below, this claim is without merit, because the instructions did alert the jury to its duty.

*Purported Defects in Intoxication Instructions*

 Defendant discerns violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution in that the court

omitted the introductory paragraph of the intoxication-related instruction CALJIC No. 4.21—namely, that for each of the crimes of which defendant was accused a necessary element was the existence of the intent to do some act or of a particular mental state. He asserts that by deleting this paragraph the court deprived the jury of the necessary guidance to conclude that evidence of intoxication could negate the intent elements of both the murder charges and the felony-murder special-circumstance allegations. He argues that the instructions given permitted the jury to conclude that voluntary intoxication could not negate the intent associated with the charges or the allegations. He further asserts that this harm was compounded by providing confusing instructions regarding general and specific intent for the underlying crimes.

The jury was instructed to view the instructions as a whole. Given that instruction, it is not reasonably likely (*People* v. *Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705]) that the jury was confused or misled regarding the relationship of defendant's intoxication evidence to his intent to commit the crimes of which he was convicted or the acts that constituted special circumstances. The court instructed: "If the evidence shows that the defendant was intoxicated at the time of the alleged offenses, the jury should consider his state of intoxication in determining if defendant had the required specific intent or mental state." (Brackets deleted.) "The specific intent or mental state required is included in the definitions of the crimes." It included a mental state element for each crime charged and, contrary to defendant's view, for the special circumstance allegations. With regard to the latter, the jury was told that to find them true it must find that defendant killed "in order to" kidnap or rape or escape the legal consequences of each crime—i.e., that his purpose was to commit the crime or escape its legal consequences.

Thus, when we view the instructions as a whole, as the jury was required to do, we find no reasonable likelihood that the jury would have understood the instructions to foreclose it from considering evidence of voluntary intoxication in connection with the felony-murder charges or special circumstance allegations. We rejected a similar claim in *People* v. *Clark* (1993) 5 Cal.4th 950, 1021 [22 Cal.Rptr.2d 689, 857 P.2d 1099]. We do the same here.

Defendant also maintains that the instructions improperly treated kidnapping and rape as so-called "specific intent" crimes for purposes of establishing the special circumstances, while treating them as so-called "general intent" crimes for purposes of establishing the underlying crimes themselves. We agree that the casual use or misuse of those terms may cause mischief, but, for reasons we gave in *People* v. *Osband*, *supra*, 13 Cal.4th at pages

685-686, any confusion caused by their use under these circumstances amounted to harmless error.

### *Failing to Instruct Sua Sponte on Manslaughter*

■ Defendant contends that the court violated state decisional law when it failed to instruct sua sponte on voluntary and involuntary manslaughter. We disagree: it committed no error.

The factual basis for defendant's claim consists of the evidence presented to the jury that he had intoxicated himself with cocaine when he killed Chandler. In his taped confession, he said, "I don't know what was going through my mind, I was so high." As we read the record, that statement is the sole possible basis for any claim that voluntary intoxication required a manslaughter instruction.

Voluntary manslaughter is treated as a lesser included offense of murder. (*People* v. *Barton* (1995) 12 Cal.4th 186, 200 [47 Cal.Rptr.2d 569, 906 P.2d 531]-201.) So, ordinarily, is involuntary manslaughter. (*People* v. *Prettyman* (1996) 14 Cal.4th 248, 274 [58 Cal.Rptr.2d 827, 926 P.2d 1013].)

■ " ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present . . . .' " (*People* v. *Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) "[R]egardless of the tactics or objections of the parties, or the relative strength of the evidence on alternate offenses or theories, the rule requires sua sponte instruction on any and all lesser included offenses, or theories thereof, which are supported by the evidence." (*Id.* at p. 160, italics deleted.) Thus "a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence." (*Id.* at p. 162.) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Ibid.*)

■ With regard to voluntary manslaughter, there is no evidence at all that it occurred. ■ "An intentional, unlawful homicide is 'upon a

sudden quarrel or heat of passion' (§ 192(a)), and is thus voluntary manslaughter (*ibid.*), if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than judgment." ' [Citations.] ' "[N]o specific type of provocation [is] required . . . ." ' [Citations.] Moreover, the passion aroused need not be anger or rage, but can be any ' " "[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citations] other than revenge . . . ." (*People* v. *Breverman, supra,* 19 Cal.4th at p. 163.) Absent the heat of passion or a sudden quarrel, voluntary manslaughter is unavailable as a lesser included offense to murder. (*People* v. *Barton, supra,* 12 Cal.4th at p. 199; see *People* v. *Hines, supra,* 15 Cal.4th at pp. 1052-1053.)

Defendant said repeatedly in his taped statement that he was "scared" when he killed Chandler. He was scared, however, only because he feared that she might cause him to be apprehended. There was no evidence of an intense or enthusiastic emotion of the type listed in *Breverman.* Rather, the evidence was that defendant's actions were calculated. The court did not err in failing to instruct on voluntary manslaughter—there was no evidence from which a jury composed of reasonable individuals could have concluded that he committed that crime. He was either guilty of the charged crime or not guilty at all. (*People* v. *Barton, supra,* 12 Cal.4th at p. 196, fn. 5.)

We turn to the question of involuntary manslaughter. Involuntary manslaughter, when not misdemeanor manslaughter, is criminally negligent unlawful homicide. (§ 192, subd. (b); *People* v. *Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926]; *People* v. *Oliver* (1989) 210 Cal.App.3d 138, 144 [258 Cal.Rptr. 138]-145.)

When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter. "Unconsciousness is ordinarily a complete defense to a charge of criminal homicide. (Pen. Code, § 26, subd. [Four].) If the state of unconsciousness results from intoxication voluntarily induced, however, it is not a complete defense. (Pen. Code, § 22.) . . . [I]f the intoxication is voluntarily induced, it can never excuse homicide. [Citation.] Thus, the requisite element of criminal negligence is deemed to exist irrespective of unconsciousness, and a defendant stands guilty of involuntary manslaughter if he voluntarily procured his own intoxication." (*People* v. *Graham* (1969) 71 Cal.2d 303, 316 [78 Cal.Rptr. 217, 455 P.2d 153].) Unconsciousness for this purpose need not mean that the actor lies still and unresponsive: section 26

describes as "[in]capable of committing crimes . . . [¶] . . . [¶] . . . [p]ersons who *committed the act* . . . without being conscious thereof." (Italics added.) Thus unconsciousness " 'can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting.' " (*People v. Kelly* (1973) 10 Cal.3d 565, 572 [111 Cal.Rptr. 171, 516 P.2d 875]; *People v. Heffington* (1973) 32 Cal.App.3d 1, 9 [107 Cal.Rptr. 859].)

■ There was no *quantum satis* of evidence to warrant an instruction. As we have described, defendant approached Chandler and had the presence of mind to tell her to be quiet, to display a knife, and to take her to the secluded precincts of the Florence Flanner School. He asked her to remove her pants. Later she asked if she could put her pants back on, and he gave permission. All of these facts show a methodical, calculated approach to the crimes. There was no evidence that he then consumed more cocaine before stabbing her. Rather, he reflected on the possible consequences of letting her live, decided that the risk was too great, and killed her. That was malice aforethought. His statement that he did not know what was going through his mind *does not present* conflicting evidence for the trier of fact to evaluate— even read in isolation, it would be ambiguous, and insufficient to permit a jury composed of reasonable individuals to find that he committed involuntary manslaughter. Read in context, we understand his remark only to mean that his intoxication clouded his judgment and caused him to make foolish choices, not that he lacked malice aforethought. Thus the court did not err in failing to instruct on involuntary manslaughter—there was no evidence from which a jury composed of reasonable individuals could have found that he committed that crime. As stated earlier, he was either guilty of the charged crime or not guilty at all. (*People v. Barton, supra*, 12 Cal.4th at p. 196, fn. 5.)

Defendant further contends, in a parenthetical manner, that the court's omissions violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 15 and 16, of the California Constitution. But he rests these perfunctory claims entirely on his claim that the court failed to follow state decisional law. We have explained that it did not so err. Because the basis on which he rests his constitutional claims is itself meritless, so are his constitutional claims.

*Denying Motion to Modify Instruction on Identification's Reliability*

■ The court instructed the jury according to CALJIC No. 2.92 (apparently following *id.* (4th ed. 1987 supp.); accord, *id.* (5th ed. 1988 bound vol.)). The instruction listed 12 factors that may affect the accuracy of an eyewitness's identification. The court added two paragraphs, based on a

proposal it made to try to accommodate the parties, regarding Charlotte J.'s identification of defendant.[5] But it denied defendant's apparent request (the reporter's transcript implies that he made it, but the precise language appears only in the clerk's transcript) to add to the standard language of the instruction one of the following two paragraphs, in order of his preference:

"One of the factors you may consider is whether any photographic lineup in which the defendant was identified was unfair or suggestive. You are hereby advised that a photographic line-up which depicts a single suspect is deemed unfair and suggestive as a matter of law."

"You may also take into account that an identification made from a single photograph of a person is considered to be suggestive and less reliable than one made from a group of persons with similar general appearance."

Defendant may be understood to contend that denying his request violated state law. His claim, however, is utterly meritless. Giving the first instruction

[5] The instruction given to the jury read (with brackets omitted):

"Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crimes charged. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness' identification of the defendant, including, but not limited to, any of the following:

"The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act;

"The stress, if any, to which the witness was subjected at the time of the observation;

"The witness' ability, following the observation, to provide a description of the perpetrator of the act;

"The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness;

"The cross-racial or ethnic nature of the identification;

"The witness' capacity to make an identification;

"Evidence relating to the witness' ability to identify other alleged perpetrators of the criminal act;

"Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup;

"The period of time between the alleged criminal act and the witness' identification;

"Whether the witness had prior contacts with the alleged perpetrator;

"The extent to which the witness is either certain or uncertain of the identification;

"Whether the witness' identification is in fact the product of his own recollection;

"Whether allowing Charlotte [J.] to see a profile photograph of the Defendant without also showing her profiles of the other persons in the photographic lineup was an unduly suggestive procedure that led to an erroneous identification of the Defendant.

"Whether the subsequent identifications by Charlotte [J.] of the Defendant were based on an erroneous photographic identification or whether they were based on her observation of the perpetrator which she has identified as the Defendant.

"Any other evidence relating to the witness' ability to make an identification."

Except for the penultimate and antepenultimate quoted paragraphs, the language is that of CALJIC No. 2.92 (4th ed. 1987 supp.).

would not have correctly stated the law, and to supply it would have been error (see *People v. Gordon, supra,* 50 Cal.3d at p. 1275): as stated *ante,* at page 413, there is nothing inherently unfair about a single-person showup. And he is incorrect to claim that the court erred in refusing his alternative instruction. The instruction the court gave (see the antepenultimate quoted paragraph in fn. 5, *ante*) stated the same thing in language that was at least as forceful, if not more so, than what he proposed. Finally, a jury need be instructed under CALJIC No. 2.92 only if "identification is a crucial issue and there is no substantial corroborative evidence." (*People v. Wright* (1988) 45 Cal.3d 1126, 1144 [248 Cal.Rptr. 600, 755 P.2d 1049].) In this case Ramage's testimony furnished substantial corroborative evidence—he described fully the attack on Charlotte J.—and the court would not have erred had it entirely denied a request for the instruction. In giving it, and notably in giving two additional paragraphs focusing on Charlotte J., the court gave defendant more than he was entitled to.

### Adequacy of the Special Circumstance Verdict Forms

■ Defendant claims that an error in the verdict form's language caused a violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

As described *ante,* at page 420, the special circumstance verdict form asked for a finding that in committing the acts giving rise to the two special-circumstance allegations defendant intended to kill. Prior to this language, the form asked the jury to find true or not true each special circumstance, namely that he murdered Chandler while "engaged in the commission of the crime" (rape and kidnapping) "within the meaning of Section 190.2(a)(17) Penal Code."

Defendant contends that this general language, coupled with the inquiry whether he intended to kill, made it impossible to tell whether the jury decided that he had an independent purpose in committing the underlying felonies—i.e., that those crimes were not "merely incidental to the murder" (*People v. Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468]).[6] If they had been, the special circumstances should not have been found true. (27 Cal.3d at pp. 61-62.)

In general, a verdict form need not restate the legal principles provided in proper instructions. Indeed, as a rule it is not reversible error to fail to provide the jury with a verdict form at all (*People v. Osband, supra,* 13

---

[6]*Green* was overruled on another point by *People v. Hall* (1986) 41 Cal.3d 826, 834, footnote 3 [226 Cal.Rptr. 112, 718 P.2d 99].

Cal.4th at pp. 689-690), though plainly it is the better practice. We agree with defendant that a verdict form may not state principles "contrary to the instructions given" (*Byrum* v. *Bland* (1990) 219 Cal.App.3d 926, 938 [268 Cal.Rptr. 609]), for doing so might cause the jury to disregard or discount those principles. But that did not occur here. Inquiring of the jury on the verdict form whether he intended to kill did not contradict the instruction not to find a felony-murder special circumstance true if the underlying crime "was merely incidental to the commission of the murder." It is an axiomatic presumption on review that the jury followed this command. We do not discern any reasonable likelihood (*People* v. *Clair, supra,* 2 Cal.4th at p. 663) that the instructions were misleading or confusing in a way that would cause it to misunderstand its duty in deciding the truth of the special circumstance allegations when examining the verdict form. To the contrary, the instructions were quite clear, and the verdict form did not contradict them. Defendant's constitutional rights were not violated.

### Claims of Prosecutorial Misconduct

Defendant discerns several instances of guilt phase prosecutorial misconduct. We find no merit in any of his contentions.

### During Jury Selection

Defendant claims that the prosecutor committed three instances of misconduct during the voir dire of prospective jurors. In all three cases, the prospective jurors sat on the trial jury.

"The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People* v. *Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

Defendant failed to request an assignment of misconduct to any of the questioning he now discerns to be improper. Accordingly, he has not preserved his claims.

Defendant maintains that, if counsel failed to preserve his claims, they were ineffective for failing to object to the questioning and preserve the points for appeal. In light of this argument, we will address his claims on the merits. As will appear, there was no ineffective assistance of counsel.

■ First, defendant maintains that when the prosecutor asked Dolores A., "Will you promise me that if you sit on this jury and you feel that death is the appropriate verdict, that you will come back into this court and render that verdict of death?" The prospective juror agreed.

Defendant asserts that the prosecutor was asking Dolores A. to vote for death. That is incorrect. He was asking her to promise to vote for death if she felt that such were the appropriate verdict—i.e., he was seeking a commitment from her to do her duty. There was nothing improper about asking her to follow the law.

■ Next, defendant insists that the prosecutor committed misconduct by asking Lyle V. whether he had voted for a ballot proposition to enact the death penalty or would vote for such a penalty in a public election. He claims that the question violated Lyle V.'s rights to privacy (see Cal. Const., art. I, § 1) and to refuse to disclose such information (Evid. Code, § 1050).

Defendant may be correct, but he does not show prejudice to himself. The injury, if any, was to Lyle V., and not to him.

Next, defendant contends that it was misconduct for the prosecutor to ask prospective juror Agustus D. whether this court's capital opinions under former Chief Justice Rose Bird were "kind of off base" and whether the vote not to retain her or other justices was correct. The prospective juror replied that he thought the adverse vote was correct, but also that "in ways, I also admire her [Rose Bird]" and that the defeated justices "were doing their job as they saw it . . . and adhering to the technical parts of that type of law."

This is not the first time that a party has raised this subject or attempted to do so during the voir dire portion of a trial. (*People* v. *Ramos* (1997) 15 Cal.4th 1133, 1158 [64 Cal.Rptr.2d 892, 938 P.2d 950]; *People* v. *Morales* (1988) 203 Cal.App.3d 970, 974 [250 Cal.Rptr. 240].) Again, we are unable to discern how this line of questioning could have prejudiced defendant. He calls the questioning "egregious" and an invasion of Agustus D.'s privacy,

but, as we concluded in the case of the question put to Lyle V., any injury was to the prospective juror and not to him.

To summarize, none of the questions resulted in prejudice to defendant. Hence counsel were not ineffective for failing to object to them.

### During Presentation of Evidence

Defendant identifies three instances of prosecutorial misconduct during the presentation of evidence.

First, he contends that the prosecutor committed misconduct by failing to inform him of exculpatory evidence. We have rejected the premise for his contention, namely that there was any exculpatory evidence within cases interpreting the due process clause of the Fourteenth Amendment to the United States Constitution. (*Post*, at pp. 470-475.) There was no misconduct.

Next, he maintains that the prosecutor committed misconduct when he solicited what he knew to be perjurious testimony by Ramage, and thereby violated constitutional guaranties. He bases this claim on assertions that (1) Ramage participated in Chandler's murder but was allowed to testify that he did not, and (2) Ramage had met Chandler but was allowed to testify that he had not.

In fact the prosecutor had no reason to believe that Ramage, who by his statement to Baxter selflessly exposed himself to great criminal liability even though he was suspected of no wrongdoing, was falsely testifying about his presence at the murder scene. (See also *post*, at p. 474.) There was no physical or testimonial evidence tying him to that location.

Nor does defendant show that Ramage perjured himself regarding his acquaintanceship with Chandler. Ramage testified in response to *defendant's* questions that he "didn't know" Chandler and that "I haven't even seen her. . . . I don't know that person." But immediately thereafter he said that Saundra Baxter "did ask me if I knew [Chandler], and I said . . . I might have seen her going to school . . . ."

Baxter had testified that Ramage told her he knew who Chandler was; he testified that he did not "know her personally" but might have seen her in the neighborhood. The discrepancy, if it is one at all, does not necessarily reveal false testimony, much less perjury: Baxter's memory could have been faulty, or Ramage's, or both. More likely, Ramage was having difficulty articulating the difference between knowing Chandler personally and having seen

her in passing. In sum, the prosecutor was entitled to allow evidence to be presented that he believed was true and that, following a satisfactory police investigation, appeared to be true. There was no violation of any constitutional provision.

 Next, defendant contends that the prosecutor committed misconduct by asking Yolanda A. whether a spot of blood in her eye might be "blood from like a bloody nose or from broken blood vessels?" The court had directed the prosecutor to limit his question to whether the spot appeared to be formed of blood. Defendant argues that his convictions for the counts relating to the attack on Yolanda A. must be reversed as a result.

The prosecutor did commit misconduct by exceeding the limits of the court's ruling. It was, however, de minimis. Under any standard of review, we do not believe that the misconduct prejudiced defendant.

### During Closing Argument

 Defendant identifies two instances of prosecutorial misconduct during closing argument.

First, defendant asserts that misconduct occurred when the prosecutor commented on the failure of his expert witness, Dr. Gorelick, to testify that his cocaine use could have caused him to commit the crimes. Prior to this, the prosecutor had obtained an offer of proof from defendant that he was not going to ask Dr. Gorelick "for an opinion in this case as to the state of mind of the defendant at the time any of these crimes were committed[.]" Then in closing the prosecutor argued that "drugs didn't make this happen. . . . The doctor didn't testify to that. [¶] . . . [¶] That doctor was not given a hypothetical question about Mr. Ochoa and asked, 'In your opinion did the drugs cause this?' So remember what you do have in evidence, but also realize what you don't have in evidence. Because, in reality, you don't have anything except that you are told that cocaine is an addictive drug and Lester Ochoa used cocaine." The prosecutor later argued in rebuttal that Dr. Gorelick "never took the situation with Mr. Ochoa and said that, 'Knowing Mr. Ochoa's situation and the drugs that he used . . . my opinion is that the drugs in this situation caused a chemical imbalance and caused him to go out and do something and he could not keep from doing it.' "

Defendant contends that the prosecutor was improperly commenting on the absence of diminished capacity testimony, which he could not elicit because the diminished capacity defense has been abolished (*People* v. *Mayfield* (1993) 5 Cal.4th 142, 198, fn. 10 [19 Cal.Rptr.2d 836, 852 P.2d

331]). And he notes that section 29 would have prohibited the kind of hypothetical testimony whose absence the prosecutor criticized before the jury.

Though the question is close, we agree with defendant that the prosecutor's comments were misconduct in light of the prohibition contained in section 29. That statute provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (*Ibid.*)

By its terms, section 29 prohibits an expert witness from giving an opinion about the ultimate fact whether a defendant had the required mental state for conviction of a crime. It prohibits no more than that. It is true, however, that criticizing Dr. Gorelick for failing to testify about defendant's ability to cogitate—i.e., for failing to testify that "[k]nowing Mr. Ochoa's situation and the drugs that he used . . . my opinion is that the drugs in this situation caused a chemical imbalance and caused him to go out and do something and he could not keep from doing it"—amounted to a criticism of him for not testifying on the ultimate issue whether defendant had the required mental state for a form of first degree murder, namely the ability to premeditate, deliberate, and intend to kill.

By failing to request an assignment of misconduct to the prosecutor's remarks, defendant has failed to preserve his point for review, for such an objection would have permitted the trial court to cure any harm that resulted (*People* v. *Osband, supra,* 13 Cal.4th at p. 693). (See *People* v. *Rangel* (1992) 11 Cal.App.4th 291, 299 [14 Cal.Rptr.2d 529]-300.) Because defendant contends that counsel were ineffective for failing to assign misconduct, however, we will address it "on the merits to the extent necessary to decide the ineffective assistance claim." (*People* v. *Osband, supra,* 13 Cal.4th at p. 693.) We have already explained that misconduct occurred. But we do not discern prejudice. The prosecutor only argued that defendant missed an opportunity to elicit favorable testimony about his mental state. In a very close case, such argument might galvanize the jury and make a difference. Here, by contrast, the evidence of premeditation, deliberation, and intent to kill was strong. Defendant *admitted* that he killed Chandler because he was scared that she might lead to his apprehension. And he stabbed her many times and dragged her back and forth in an effort to hide her body. His ineffective assistance claim fails to persuade—there is no reasonable probability of a different outcome.

Next, defendant contends that the prosecutor committed misconduct when, in arguing that he intended to kill Yolanda A., he improperly argued that defendant had a propensity to kill because of bad character: "Does this sound to you like a man, based on the crimes that you've heard in this courtroom, the acts that he's committed, does it sound to you like a man who wants to rape and kill women?"

If this was misconduct, however, it resulted in no harm to defendant: the jurors acquitted him of attempting to murder Yolanda A. The prosecutor's argument did not succeed.

### Cumulative Effect of Misconduct

Finally, defendant maintains that the guilt phase proceedings were so tainted by instances prosecutorial misconduct that their cumulative effect requires reversal of his convictions. But we have found either no misconduct at all or misconduct minor enough that no prejudice arose from it. We reject the claim.

### Ineffective Assistance of Counsel

### Failing to Challenge Shoe Print Testimony

Defendant contends that counsel were ineffective for failing to object to the introduction of evidence regarding analysis of shoe prints. (*Ante*, at p. 389.) He maintains that this evidence was substantially more prejudicial than probative (Evid. Code, § 352) and that counsel should have sought its exclusion.

The claim is without merit. The evidence plainly had probative value: it showed that the design of defendant's shoe sole was consistent with shoe prints left at the scene. It was for the jurors to assign whatever weight to the evidence they thought it merited. A motion to exclude such evidence under Evidence Code section 352 would surely have failed. Counsel did not perform deficiently for failing to make what would have been a meritless request.

### Purportedly Failing to Ask for Semen Sample

Next, defendant claims counsel were ineffective for failing to obtain a semen sample from Alvarado, Chandler's boyfriend. It will be recalled that the couple engaged in sexual relations on the night defendant killed her. It will also be recalled that semen found on Chandler's pants could have

come from Alvarado, assuming that only his semen was present there. Moreover, there was too little semen on the vaginal and rectal samples to be able to classify it according to blood type, and therefore it could have come from Alvarado as well.

The record shows that defendant moved to have the court order Alvarado to submit a semen sample for analysis. He argued that testing already showed that he could not have provided the semen found on Chandler's pants, but that Alvarado could have, and that testing Alvarado's semen might conclusively show that he also did not provide the semen found on the pants, in which case it would suggest that someone other than defendant raped Chandler. The presence of such an accomplice, he asserts now, could have undermined the prosecution's theory of the case.

The court replied that it was uncertain whether it had the power to order Alvarado to provide a semen sample. It invited counsel for both parties to research the issue further. Later defendant announced that he agreed the court had no authority to order the sample. But the court suggested that defendant try to persuade Alvarado to provide it voluntarily. The parties agree that the record is silent on whether either party ever asked Alvarado to provide a semen sample.

On this record we cannot find any basis for an ineffective assistance of counsel claim. One or both of the parties might have asked Alvarado to provide a semen sample, or might not. If so, he might have refused, or might not. Defendant does not point to any law that would have required him to provide one. There is no way to evaluate a claim of deficient performance.

### Permitting Defendant to Testify at the Suppression Hearing

Next, defendant contends that counsel were ineffective for letting him testify at his suppression hearing and thereby creating an opportunity for the trial court to rely on his implausible version of the events surrounding Chandler's killing in denying his new trial motion (*post*, at pp. 475-476). We will explain in our discussion of the new trial motion, however, that the court would have denied the motion even if it had not taken into account defendant's testimony at the suppression hearing. He fails to show prejudice—i.e., a reasonable probability of a different result had he not testified.

### Failing to Further Develop Drug Usage Defense

Next, defendant contends that counsel were ineffective for failing to investigate and develop a more thorough defense based on the effects of

drug usage. He maintains that they antagonized the jury by presenting evidence of his abuse of drugs, a habit that the jury was certain to despise, but having done so, failed to follow through with evidence that through voluntary intoxication he lacked the mental state required for the crimes.

But it is black letter law that "if the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject [an ineffective assistance of counsel] claim on appeal unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance." (*People* v. *Castillo* (1997) 16 Cal.4th 1009, 1015 [68 Cal.Rptr.2d 648, 945 P.2d 1197].) Counsel might reasonably have concluded that the available intoxication evidence conceivably could persuade the jury that defendant lacked the ability to form the required mental state for the crimes, even though his own confession supplied strong evidence that he intended to kill to silence Chandler. We reject the contention.

### Failing to Obtain Adequate Voluntary Intoxication Instructions

Defendant also contends that counsel were ineffective for failing to obtain adequate instructions on voluntary intoxication. But as we have explained, the instructions were adequate. (*Ante*, at pp. 421-422.) And he complains that counsel failed to seek instructions on manslaughter. But we have also explained that he was not entitled to manslaughter instructions. (*Ante*, at pp. 422-424.) Counsel cannot have been ineffective for failing to seek an instruction for which there was no supporting evidence: the court should properly have denied such a request.

### Quality of Closing Argument

Finally, defendant condemns the quality of the closing argument presented on his behalf. In his view, it was deficient in that counsel (1) conceded his guilt of murdering Chandler and attacking Yolanda A., seriously disputing only the Charlotte J. charges; (2) did not insist that he lacked the mental state for the Chandler crimes; and (3) did not contest or even discuss the special circumstance allegations.

As mentioned, counsel argued that defendant was not guilty of first degree murder, but only murder of the second degree. "[W]e have repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt." (*People* v. *Freeman* (1994) 8 Cal.4th 450, 498 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].) In general, their decision to concede his guilt of various crimes against Chandler and Yolanda A. while arguing that

others were not proven was a reasonable tactical choice, given the evidence of the attacks. " '[G]ood trial tactics often demand complete candor with the jury, and . . . in light of the weight of the evidence incriminating a defendant, an attorney may be more realistic and effective by avoiding sweeping declarations of his or her client's innocence.' " (*Ibid.*)

Counsel did argue that defendant lacked the mental state for premeditated first degree murder. Given his confession that he intended to kill Chandler, and testimony that he inflicted 23 stab wounds on her, averaging approximately 4 inches deep, it cannot be called deficient to concede the question of malice aforethought. Choosing to forgo an implausible argument that he killed without malice aforethought was a reasonable tactical choice.

In sum, counsel cannot be faulted for exercising candor. At the end of closing argument, they argued: "The law has been stated to you very carefully and, literally, each and every element, each and every requirement for a conviction—and . . . your duty is . . . to take that very, very seriously and not have a visceral or gut reaction to these crimes, but to seriously apply the law as it's written down for you." They would have risked offending the jurors to demand this exacting standard of them while simultaneously advancing implausible arguments that the jurors might well regard as insulting their intelligence.

As for counsel's failure to discuss the special circumstance allegations: though the closing argument did not mention them, counsel could have reasonably concluded there would have been little to say. Defendant's confession and the physical evidence strongly suggested that the allegations were true, and counsel might reasonably have viewed contrary argument as a distraction with potential to weaken more meritorious points.

### Cumulative Effect of Ineffective Assistance of Counsel

Defendant also contends that the cumulative effect of counsel's errors and omissions amounted to ineffective assistance of counsel. We have stated throughout the guilt phase discussion, however, that counsel performed their task largely free of deficient performance, and certainly free of any lapse of constitutional dimension. We reject this claim as well.

### Cumulative Effect of Purported Defects in the Guilt Phase

Defendant contends that the cumulative effect of jury selection error, ineffective assistance of counsel, and prosecutorial misconduct requires that his convictions be reversed. To do otherwise, he claims, would offend the

due process clauses, and he implies that it would also offend the constitutional guaranties to be tried by an impartial jury. But we have found neither trial court error, nor prosecutorial misconduct that prejudiced him, nor ineffective assistance of counsel. His claim is without merit.

### THE PENALTY PHASE

*Defendant's Alleged Killing of His Young Son*

The key dispute, resolved prior to the presentation of evidence at the penalty phase, was whether the prosecution would be allowed to introduce evidence that defendant fatally injured his son, 18-month-old Robert Lester Ochoa, on February 8, 1987, probably by hitting him and causing his head to strike a surface. He died the next morning at the hospital and was autopsied.

Without this evidence, the prosecution advised that it would "either have nothing to present in the penalty trial or very little, maybe a total of a day's worth of testimony . . . ."

The trial court decided to hold, on its own motion, "a preliminary inquiry before the penalty phase to determine whether there [was] substantial evidence to prove each element of [this] other [alleged] criminal activity." (*People* v. *Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423] (lead opn.); see Evid. Code, § 402.) The court declared that it would require the prosecution to satisfy it "that there is substantial evidence that the child died as a result of a crime . . . before I allow the People to introduce evidence of this incident . . . ."

The trial court ruled that evidence that defendant killed his son could be admitted at the penalty phase. The prosecution elected not to introduce it in its case-in-chief, however; it held it for possible use as rebuttal evidence. Ultimately it never introduced the evidence. Outside the jury's presence defense counsel explained that "the People have rested without putting on evidence of the—concerning the death of the minor child but have stated they're holding it as possible rebuttal, and . . . the defense is not putting on what we would normally consider to be a significant portion of our penalty phase evidence, namely the relationship between Mr. Ochoa and his children, because of the rebuttal aspect of the death of the child. I just wanted to make that clear for any reviewing court." The court noted in reply that it had "made no prior *ruling* about what would or would not be admissible on rebuttal."

The foregoing statement forms the basis for the claim of prejudice on appeal. The ruling, defendant contends, forced him "into withholding important mitigating evidence during the penalty phase of the trial. The jury did *not* hear about what could only be described as the most important part of his life—that he was a loving and devoted father of two beautiful children who showed no signs of any child abuse. In addition to informing the jury that [he] was a father, the tragic death of [his] little boy could very well have served as a powerful mitigating circumstance itself."

There was testimony at the *in limine* hearing that defendant told an investigating sheriff's detective he was alone with his son when he was injured. He explained to him that he saw him falling off a kitchen counter—measurements showed the countertop to be 37 inches from the linoleum floor—that he tried to grab him too late, and that the child struck the floor on the chest and face. He took him to a bedroom "and he laid the child down and noticed that [he] seemed to be unconscious, not really responsive, and he wasn't sure about how to get ahold of an emergency medical [response] through 911 or something . . . but shortly after that . . . he saw car lights coming into the driveway . . . and ran outside with the child." Defendant's wife and mother were in the car; they took Robert Ochoa to the hospital.

Dr. Lakshmanan Sathyavagiswaran, a physician and Chief of Forensic Medicine in the Los Angeles County Medical Examiner's Office, testified that Robert Ochoa, whose death was originally found to be an accident, died of "severe brain and skull injuries." He also had two bruises on his right arm. Dr. Sathyavagiswaran testified that unless Robert Ochoa had fallen "from multiple stories, a great height" his death could not have been accidental. And he was lacking the kind of abrasions and other injuries that such a fall would usually cause. Instead his injuries revealed "a tremendous force with which this particular child's head struck [a] fixed object." These injuries could have been caused by "[t]he child being thrown on the ground or struck and landing forcibly on the ground or against a wall," and Dr. Sathyavagiswaran believed that "the child was probably struck with great force, either the left or right side of the face to begin with, and the child landed forcibly on a hard surface which is not rough," or, as a less preferred alternative, "could . . . [have] been thrown [forcibly] . . . against a smooth surface"; but the injuries could not have been caused by a fall off a 37-inch-high countertop onto a linoleum floor. On March 11, 1988, the medical examiner's office changed its records to reflect that Robert Ochoa's death was a homicide.

Defendant introduced the testimony of a forensic pathologist, Dr. Werner Spitz. He testified that Robert Ochoa's death was compatible with an

accident of the type defendant had described. He would not disagree, however, with Dr. Sathyavagiswaran's opinion that it was homicide, though he did not agree that if accidental it could only have been caused by a fall from a great height. Ultimately he concluded that, on the basis of the information available to him, which appeared to be the same information available to Dr. Sathyavagiswaran, the cause of injury and the manner of death were undeterminable.

*Penalty Phase Evidence That Was Introduced*

The prosecution introduced evidence of defendant's prior violent criminal activity (§ 190.3). Dong Hyuk Kim testified through an interpreter of Korean that in 1986 he was exiting a doughnut shop when a man grabbed him with great force and pulled at him. A Los Angeles police officer, Fred Faustino, testified that Kim had defendant arrested for battery. As another police officer was handcuffing him he broke away, pushed the officer back, and had to be subdued. The incident occurred in the early morning hours.

Silvia V. testified through an interpreter of Spanish that early on the morning of February 6, 1983, she passed a man on her way to her car. As she was sitting with the door ajar he came up and pushed her inside. She warned him in English that her husband was on the way. He got on top of her, told her to shut up, and hit her repeatedly, especially when she tried to glimpse his face. In turn she pulled his hair, scratched his face, and sounded the horn with her foot. Her honking attracted a neighbor's attention but no help— instead the neighbor yelled at her to be quiet. Eventually the assailant fled. He left her face and mouth very swollen. The prosecutor did not ask her to identify defendant in court as her attacker—he explained at bench that "[s]he won't even look in his direction. She's scared to death of him"—but the records manager of the Baldwin Park Police Department testified that charges were filed against a Lester Ochoa, born March 26, 1961, for the attack. The parties stipulated that the date was defendant's date of birth, and the court later admitted into evidence the written record of a filed misdemeanor complaint alleging that on February 6, 1983, one Lester Robert Ochoa committed grand theft (§ 17, subd. (b)(4); *id.,* former § 487, subd. 2, as amended by Stats. 1982, ch. 375, § 1, p. 1693; *id.,* former § 489, as amended by Stats. 1976, ch. 1139, § 223, p. 5124) and battery (§ 242) against one "Sylvia V.," of the same last name as Silvia V.

The defense began with a candid opening statement. (Defense counsel told the trial court that candidly revealing defendant's background and character was their strategy at the penalty phase.) Counsel acknowledged that defendant had "a side of him that is aggressive, violent and cruel." But counsel said

that the defense intended to try to give the jury "a more complete picture of who Lester Ochoa is and what he has been . . . and maybe a little bit of an insight into how he's gotten here. [¶] There aren't going to be any startling revelations." Counsel also said the evidence would show that he "can feel remorse and . . . guilt and . . . pain like any of you can." Counsel declined to ask for leniency. It would be "beyond your power to grant that in this case. Whatever you decide is going to be a harsh and severe sentence."

Defendant's older sister, Arlene Cook, testified that drugs had severely altered his behavior. As a young boy he was outgoing, friendly, respectful, and involved in baseball. His parents had good jobs and treated him well and with love; indeed "[h]e was sort of spoiled." Later, as a teenager, he was in trouble with the law, was incarcerated for more than a year at age 16 or 17, and was plagued by drug abuse. He was "mean," "belligerent," uncaring, and impatient when intoxicated, but "calm," "[g]entle," and jocular when not. Once his family discovered him "whimpering," "huddled . . . like a wounded animal" in a closet, and asking for help, apparently during an episode of withdrawal from the effects of drug-induced intoxication. Family members tried to dissuade him from abusing drugs but could not succeed. He could not maintain attendance in a residential drug-treatment program. "He was making excuses to come out, and they let him . . . ." He loved and still did love his wife.

Defendant's younger sister, Sharon Ochoa, a licensed vocational nurse who had worked in a drug detoxification center, confirmed her older sister's testimony in most respects. She testified, however, that defendant's personality began to deteriorate in his 20's, rather than in his teens. Once when he was physically abusing his wife, Elva, Sharon, who was home alone with them, "got a bat and I threatened him [that] if he didn't leave her alone, I'd hit him, and he eventually left her alone." She also saw defendant fight her father more than 15 times, and he once threw a knife at him; also he physically fought with his wife more than 10 times. But when sober he would show remorse over his drug use and would try to improve himself.

Defendant's wife, Elva Ochoa, also a licensed vocational nurse, testified about his Jekyll-and-Hyde personality and how his drug and alcohol abuse destroyed their very close and loving relationship. His work habits deteriorated, he would demand money from her, and he began to pawn their possessions.

Yolanda A., the victim of one of defendant's attacks and a witness against him at the guilt phase, testified on his behalf that if he were not on drugs in the future she would not be frightened of him. On cross-examination, she testified that she had seen him violent some three times.

Everett Sosa testified that he grew up with defendant and had been his friend. He confirmed the others' testimony regarding the effects of drugs on defendant's personality. Defendant told him that he wanted to quit using drugs, and at one point attended Bible study classes that Sosa had arranged.

Defendant's mother, Velia Ochoa, largely recapitulated his sisters' testimony about his life. She mentioned that at about age 20 someone lacerated him with a broken bottle and only a surgeon's skill saved him. They tried to get help for his drug problem "but it seems that the doors are closed when you really need it . . . . [T]here was no room, waiting lists, or else [we] didn't have insurance." She tried to have him committed but did not succeed. "[T]he drugs . . . took him."

Defendant called James Park, a consultant with 31 years' experience in the California Department of Corrections, including supervising death row at San Quentin prison. He had also served as the statewide supervisor of prisoner classification. He testified that defendant, if sentenced to life imprisonment without possibility of parole, would automatically receive the highest security classification, level four, and would probably remain so classified for two generations. He opined that defendant "would adjust well to the maximum security prison setting, which is not the most pleasant in the world, and he would be a productive prisoner." He described the kind of work available to maximum security prisoners, including making clothing for mental hospital patients and furniture for state offices. "In my experience and having seen many people with life terms or life without possibility [of parole], getting a term like that seems to have a very sobering effect on people."

On cross-examination, Park acknowledged that drugs are available in prison, though probably harder to obtain than outside. He also acknowledged that maximum security prisoners can obtain or make weapons in theory, but that "it would be very very difficult to get weapons in the new maximum security prisons . . . ."

Kenneth Leinweaver, a Los Angeles County deputy sheriff, testified that defendant had been a trusty in Leinweaver's jail module—an eight-hour-a-day job that involved clerical and manual tasks. Defendant was a good trusty during the month and a half he was in the module under Leinweaver's supervision, meaning that he was not aggressive, was fairly intelligent, and was willing to work productively. He got along well with other prisoners, and he was the lead trusty on the graveyard shift.

Stanley White, the detective who interrogated defendant, testified that he showed signs of remorse when confessing, had been crying, and that he asked for help "for what he had done."

Dr. Gorelick, who had testified on defendant's behalf at the guilt phase, testified that cocaine use probably causes biochemical or neurochemical changes in the brain, and that research was proceeding to try to undo any such changes. Some cocaine addicts cannot control their abuse of the substance, which Dr. Gorelick opined is the most addictive drug he had encountered.

On cross-examination, Dr. Gorelick testified that the most important indicator of success in overcoming cocaine addiction is the will to participate in a treatment program for a considerable time.

The prosecutor argued to the jury that defendant was a spoiled, self-indulgent, self-centered thrill-seeker who liked to torment and molest women for pleasure. He maintained that despite his history of drug abuse defendant knew what he was doing when he killed Chandler and assaulted Charlotte J., Silvia V., and others. He argued generally that defendant's violence toward others rendered him unfit to live. For example, Charlotte J. "came in here and testified, and you saw—she tried to hold it back, but you saw what that woman went through. [She was] treated like a dog."

In turn, defense counsel argued that each juror, as an individual, should put himself or herself beyond the prosecutor's impassioned argument and spare defendant's life. Counsel acknowledged that he was "as horrified and as shocked . . . about the things that you've heard" as were the jurors themselves, but urged them to recognize that society would be safe from defendant, and he would be severely punished, by a lifelong prison sentence, a term that "many people . . . would consider . . . as harsh a penalty as his death."[7] Life in prison would be harsh, friendless, and frightening. Yet he had some chance to be a productive member of prison society. Though he chose to "become part of the drug culture," he did not choose to become a drug addict, and he was "good" and "loving" when sober, even if "hateful and ugly" when intoxicated. Drug abuse did not excuse his crimes, but "not only is cocaine an addiction and national tragedy, but the fact that people can't really get treatment for it is probably another one, too, because without money or medical insurance, it just isn't available to get off cocaine addiction."

Counsel acknowledged that defendant had appeared "stoic [and] impassive during most of this trial," but argued that he did feel remorse and shame. "Lester's feelings after the murder are best illustrated by what he did at that time, not by what he's done in this courtroom or how he has acted. [¶]

---

[7] As noted *post*, at page 445, Juror Lyle V. believed that life imprisonment without possibility of parole was a worse sentence than death.

You're going to decide in this case whether Lester Ochoa dies because of his remorse and because of his shame and pain after the incident. [¶] I understand [the prosecutor's] emotions and his anger and passion when he argued this morning, and I can feel it, too, but I—there is something that offends my sensibility when the one thing Lester Ochoa did which was a right thing in this case, that he gets absolutely no credit for, that is looked upon with disdain and sneered at, and that is the fact that Lester Ochoa went to the police department and he confessed to this murder. [¶] He cried. He asked for help. He said he felt he wanted to get these things off of his chest. And he didn't ask for any favors." Had he not confessed, there would have been no evidence to connect him to Chandler's killing and he would not be facing the death penalty. His confession was "the one thing that most mitigates against the death penalty in this case, that Lester Ochoa came forward." Killing him would only be an act of vengeance, and "vengeance is not your job."

Following defendant's argument, which ended about 2:00 p.m., the jury deliberated for the rest of the afternoon of November 21, 1988, and shortly before noon the next day the clerk announced its verdict of death.

### Jury Selection Issues

Because defendant's jury selection claims all relate to penalty, we address them here. He was tried by a jury of 12 at both the guilt and penalty phases.

### Granting Prosecution's Motion to Excuse Prospective Juror for Cause

Defendant contends in effect that the court violated the due process clauses when it excused prospective juror Sandra M.

On *Hovey* voir dire (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301]), Sandra M. declared that she could consider a sentence either of death or imprisonment for defendant. She favored the death penalty in the abstract, and she mentioned the concept of *lex talionis*—an eye for an eye. She also testified that she could vote for either verdict, though voting for death would be a "difficult decision."

The next day, however, Sandra M. announced that she had thought deeply about the question of penalty and doubted that she could vote for death even if she thought it was the proper penalty. "I could not vote for it. I could not be a party [to] taking another person's life." The court questioned her and finally asked: "Are you saying that you would never vote for the death penalty?" She replied: "As a personal participant in that judgment[], I don't

think I ever will, sir." She also declared that she would automatically vote against the death penalty regardless of the evidence, even if she thought the extreme sentence was justified. The court granted the prosecution's challenge to excuse her for cause.

 Under the due process clauses a juror may be challenged for cause based on his or her views concerning capital punishment only if they would prevent or substantially impair the performance of the duties defined by the court's instructions and the juror's oath. (*Ross* v. *Oklahoma* (1988) 487 U.S. 81, 85 [108 S.Ct. 2273, 2276-2277, 101 L.Ed.2d 80] [speaking of the due process clause of the Fourteenth Amendment].) As a general matter, " 'the determinant is "whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror.*" ' [Citation.] If the prospective juror's responses to voir dire questions are conflicting or equivocal, the trial court's determination of the juror's true state of mind is binding upon the reviewing court." (*People* v. *Bradford* (1997) 15 Cal.4th 1229, 1318-1319 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

By excusing Sandra M. for cause, the trial court implicitly ruled that she could not impose the death penalty against defendant even if she thought the evidence merited it. That determination of her state of mind is binding on us. State law required the court to excuse Sandra M., for she acknowledged that she was "unable to act with the 'entire impartiality' required of jurors." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 183 [222 Cal.Rptr. 184, 711 P.2d 480]; see now Code Civ. Proc., § 225, subd. (b)(1)(C) [same].) There was no constitutional impediment to the exercise of state law, for her ability to perform her duties was at least substantially impaired—in fact her views prevented her from following the law. The court did not violate the due process clauses or any other constitutional guaranty by excusing her, including the right to an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution (*Ross* v. *Oklahoma, supra,* 487 U.S. at p. 85 [108 S.Ct. at pp. 2276-2277]) or under the California Constitution (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 120 [36 Cal.Rptr.2d 474, 885 P.2d 887]).

*Failing to Excuse Jurors for Cause*

Next, defendant contends that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by rulings that two prospective jurors, Leslie K. and William H., need not be excused for cause. Neither sat on the jury; both were excused following defendant's peremptory challenges.

In defendant's view, both prospective jurors were predisposed in favor of the death penalty without sufficient regard for the legal standards applied to the eventual facts—in other words, they could not be impartial as to penalty—and should have been excused for cause.

Defendant concedes that he did not use all of his peremptory challenges. Accordingly, he has waived his claim that these two prospective jurors should have been excused for cause. (*People* v. *Osband, supra,* 13 Cal.4th at p. 670.) He acknowledges that he "did not challenge any of the seated jurors for cause . . . ." He now claims perfunctorily that he was dissatisfied with the jury, but this "belated recitation" (*People* v. *Johnson* (1992) 3 Cal.4th 1183, 1211 [14 Cal.Rptr.2d 702, 842 P.2d 1]), though understandable given his death sentence, is insufficient (*ibid.*). ▮ "To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so." (*People* v. *Williams* (1997) 16 Cal.4th 635, 667 [66 Cal.Rptr.2d 573, 941 P.2d 752].) Defendant did not fulfill these requirements, nor has he justified his failure to do so.

Defendant also claims that the prosecutor committed misconduct during jury selection. We have discussed these claims *ante,* at pages 427-429.

*Ordering Prospective Jurors Not to Answer Question on Rape Penalty*

Defendant contends the trial court committed reversible error under state law in restricting questioning of the jury during *Hovey* voir dire. No abuse of discretion (*People* v. *Davenport* (1995) 11 Cal.4th 1171, 1203 [47 Cal.Rptr.2d 800, 906 P.2d 1068]) occurred.

Defendant drafted a questionnaire for the *Hovey* proceedings asking each prospective juror: "What do you feel is a proper punishment for someone who has committed a rape or other serious sexually related crime?" The prosecutor objected that the question was irrelevant to *Hovey* voir dire. The trial court agreed. It left the item on the questionnaire but instructed prospective jurors not to answer it, though inevitably some did.

▮ "The [sole] purpose of *Hovey* voir dire is to ascertain whether any prospective juror has such conscientious or religious scruples about capital punishment that his or her views would prevent or substantially impair adherence to the instructions and the juror's oath. [Citation.] The inquiry 'seeks to determine only the views of the prospective jurors about capital punishment in the abstract, to determine if any, because of opposition to the

death penalty, would "vote *against* the death penalty without regard to the evidence produced at trial." ' [Citation.] However, '[a] prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is therefore subject to challenge for cause.' " (*People* v. *Davenport, supra,* 11 Cal.4th at pp. 1203-1204.)

Thus it would have been proper for defendant to ask prospective jurors whether they would invariably vote for death if they found true a rape special-circumstance allegation. The court offered to let him ask that question. But the law did not require the court to let him ask them for their views on a proper penalty for rape on *Hovey* voir dire. "The *Hovey* rule, which requires individual questioning while death-qualifying the jury, does not extend to other matters." (*People* v. *Carpenter, supra,* 15 Cal.4th at p. 377.) There was no abuse of discretion.

### Ineffective Assistance of Counsel

As stated, a defendant claiming ineffective assistance of counsel under the federal or state Constitution must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome. (*People* v. *Ledesma, supra,* 43 Cal.3d at pp. 216-218.)

### Failing to Challenge for Cause

Defendant contends that counsel were ineffective in failing to challenge for cause Jurors Lyle V. and Anne B. and prospective jurors Joseph M. and Denise P. He insists that each showed an inability to be impartial with regard to penalty.

It is not deficient performance for a criminal defendant's counsel to make a reasonable tactical choice. (E.g., *People* v. *Fairbank* (1997) 16 Cal.4th 1223, 1243 [69 Cal.Rptr.2d 784, 947 P.2d 1321]; *People* v. *Jones* (1997) 15 Cal.4th 119, 182 [61 Cal.Rptr.2d 386, 931 P.2d 960] (plur. opn.).)[8] Reasonableness must be assessed through the likely perspective of counsel at the time. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the

---

[8]*Jones* was overruled on another point by *People* v. *Hill* (1998) 17 Cal.4th 800, 823, footnote 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].

distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland* v. *Washington* (1984) 466 U.S. 668, 689 [104 S.Ct. 2052, 2065, 80 L.Ed.2d 674].)

██ Not challenging Lyle V. was a reasonable tactical choice with regard to penalty if only for this reason: he believed that a sentence of life without possibility of parole is a worse punishment than death—it is a "cruel and unjust" sentence, because the prisoners' "conscience would never allow them to rest."

To be sure, if Lyle V. felt so strongly about the cruelty of life imprisonment that he would always vote against it, that would be reason to seek his excusal for cause. But he testified that notwithstanding his view about life imprisonment, he would not vote for death simply because of it.

Defendant complains that Lyle V. stated at one point that the death penalty should be automatically imposed for first degree murder. But he also testified that he would not automatically vote for death, but would consider the evidence presented at an eventual penalty phase with an open mind. Counsel did not pursue the point at length, and may have decided to limit their questioning because Lyle V. considered death a lesser punishment. They knew or reasonably could have suspected that the factors in aggravation at any penalty phase would be weighty and those in mitigation slight, and could reasonably have decided that Lyle V.'s view about punishment would aid defendant's cause if a penalty phase occurred.

The reasonableness of counsel's decision not to seek Lyle V.'s excusal was borne out by the prosecutor's later voir dire of him. The prosecutor felt enough concern about Lyle V.'s views on the death penalty that he asked him whether he had voted for a ballot proposition enacting it. (*Ante*, at p. 428.) He also asked: "Let's say you had just the absolute worst possible set of facts that you could ever imagine . . . and you wanted to give that guy the worst possible punishment you could possibly give him; would you vote for life without possibility of parole instead of death to punish him worse?" He answered "Yes." Returning to Lyle V.'s comment about prisoners' consciences, the prosecutor asked whether sociopaths with no feelings for others might not be bothered by introspection. The prospective juror

answered, "sooner or later it will come home to haunt them." He opined that this was happening to Charles Manson (see *People* v. *Manson* (1977) 71 Cal.App.3d 1 [139 Cal.Rptr. 275]; *People* v. *Manson* (1976) 61 Cal.App.3d 102 [132 Cal.Rptr. 265]), even if Manson would not admit it.

Defendant also complains that Lyle V. believed that he should be required to prove his innocence. The record shows that the juror had that view only until the court explained the law to him, at which point he changed his mind.

■ Next, defendant contends that an attack on 61-year-old Anne B. as a teenager left her unable to be impartial. Her testimony, however, does not support the claim.

On her questionnaire, Anne B. mentioned that she had been the victim of an assault by a teenage male when she was about 15 years old. She added that she had suffered no aftereffects. But she volunteered to the court that she was unsure that she could be unbiased. When she heard the crimes of which defendant had been accused she felt "horror," and she relived emotions she had experienced when she was attacked. She also opined that because prison life was comfortable in many respects, a sentence of life without the possibility of parole was insufficiently severe.

Defendant reserved any challenge to Anne B. at the end of his questions. Further examination established that the prospective juror would follow the law before making any decision about sentence—she answered in substance that she could set aside her views about the adequacy of punishment in the abstract and follow the requirement to return a sentence of imprisonment "unless," in the words of the court's question, "you find that the aggravating factors are so substantial when compared with the mitigating factors, that it warrants the penalty of death." She volunteered that she intended to "be impartial and listen to the evidence." Moreover, she did not believe that drug abuse always aggravated an offense; those who commit crimes while intoxicated are "responsible, but it has to be looked at in a different way from someone who plots and meditates on how the crime is going to be accomplished . . . ."

Defendant has not shown that counsel were deficient by failing to challenge Anne B. for cause. Her testimony showed that she could follow the law despite her experience as a teenager and her view that aspects of prison life are comfortable. And in some respects her views favored defendant's interests.

Defendant also claims that he received the ineffective assistance of counsel when they exercised peremptory challenges against two prospective

jurors instead of challenging them for cause. He argues that they were unable to be impartial as to penalty. Any claim of prejudice, however, is necessarily speculative. He did not exercise all of his peremptory challenges. (See *People* v. *Osband, supra,* 13 Cal.4th at p. 670.)

### Failing to Exercise All Peremptory Challenges

Defendant next contends that he received ineffective assistance of counsel when they failed to exercise all the peremptory challenges available to them. He complains that all of the seated jurors favored the death penalty and that many of them expressed a belief that conviction for certain crimes should always result in a death sentence.

"We have repeatedly rejected similar contentions. 'Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process.' " (*People* v. *Freeman, supra,* 8 Cal.4th at p. 485.) It does not do so here. " 'In complaining that counsel should have exercised more peremptory challenges, defendant selects isolated juror responses that do not give the full picture. Our review of the record does not support defendant's claim that counsel acted unreasonably in failing to exercise more peremptory challenges.' " (*Id.* at p. 486.) Moreover, defendant predicates his claim on the basis of his statement that he was dissatisfied with the jury as sworn. It does not appear that he was, however, and there would have been no basis to express discontent with a panel with which he was satisfied at the time.

### Failing to Try to Retain Prospective Juror

Next, defendant contends that counsel were ineffective for failing to try to persuade the court to retain prospective juror Sandra M. We have already explained, however, that Sandra M., on reflection, decided that she could not follow the law with regard to penalty, and that state law required the court to excuse her. (*Ante,* at pp. 442-443.) Counsel were not deficient for not trying to dissuade the court from following the law. We also note that they did not simply acquiesce in the court's ruling—after conducting further voir dire of Sandra M., and hearing the prosecutor's challenge for cause, they submitted the question.

### Failing to Challenge Purported Prosecutorial Misconduct

Finally, defendant complains that counsel were ineffective for failing to object to the prosecutor's actions during voir dire in (1) asking Dolores A. to promise to vote for death, and (2) asking two prospective jurors about voting

matters. We have explained, however, that the prosecutor did not commit any misconduct that prejudiced defendant, if he committed any at all. (*Ante*, at pp. 428-429.) Hence his claims of ineffective assistance of counsel cannot succeed.

*Other Issues*

*Claims of Error Regarding Evidence That Defendant Killed His Son*

*Ruling That the Prosecution Could Introduce the Evidence*

■ Defendant claims that the trial court erred under state law in ruling, following its hearing under Evidence Code section 402, that the prosecution could introduce as evidence of prior violent criminal activity (§ 190.3) that he killed his son, 18-month-old Robert Ochoa. (See *ante*, at pp. 436-438.) We must determine whether the court abused its discretion. (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 676.) It did not.

As stated, the court decided to conduct a hearing at which it required the prosecution to show substantial evidence that defendant unlawfully and violently killed his son. (*People* v. *Phillips*, *supra*, 41 Cal.3d at p. 72, fn. 25 (lead opn.).)

Contrary to defendant's urging, the prosecution did not bear the burden at the preliminary inquiry to establish beyond a reasonable doubt that defendant committed a violent crime. The court could accept "evidence that would allow a rational trier of fact to make a determination beyond a reasonable doubt as to [such] criminal activity." (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 676.)

It is indisputable that the prosecution produced sufficient evidence to permit a rational jury to find prior violent criminal activity on defendant's part. Defendant told the authorities that he was alone with his son, whose body bore marks of trauma. Defendant's own expert witness conceded that the physical evidence was consistent with homicide, and Dr. Sathyavagiswaran was emphatic that unless the child fell from a great height his death was not an accident, yet his injuries were inconsistent with such a long fall. There was sufficient evidence to permit a rational jury to find beyond a reasonable doubt that defendant committed second degree murder with implied malice or involuntary manslaughter—or at least simple battery.

*Corpus Delicti*

■ Next, defendant maintains that the corpus delicti for a violent crime—he refers to murder—was not established apart from his inculpatory

extrajudicial statements. He implies that Dr. Sathyavagiswaran's testimony that Robert Ochoa's death was a homicide, rather than an accident as his office had originally ruled, in turn relied on information, supplied by defendant's statement, that Robert fell off a relatively low kitchen countertop.

Distilled to its essence, the corpus delicti *rule* requires that the prosecution establish the corpus delicti of a crime by evidence independent of the defendant's extrajudicial inculpatory statements before he or she may be held to answer a criminal complaint following a preliminary examination, be convicted of an offense, or hear the statements repeated as evidence in court. (*Ante*, at p. 404.) The corpus delicti in turn consists of at least slight evidence that somebody committed a crime.

We agree with defendant's characterization of the significance of Dr. Sathyavagiswaran's testimony. Though the forensic expert favored a theory of homicide even aside from defendant's statements, he agreed that his finding of homicide was, in defense counsel's words, "at least substantially based not only on [the] physical findings, but on what the defendant said, his explanation which didn't fit."

Nonetheless, the court's ruling did not violate the corpus delicti rule, assuming solely for purposes of discussion that it applies in these circumstances. Though he ultimately based his *conclusion* of homicide on the discrepancy between the injuries and defendant's story, Dr. Sathyavagiswaran also testified that Robert died of "severe brain and skull injuries"— trauma that could only have an accidental cause if he had fallen from a multistory building. And a long fall would not "fit with the external injuries on the face of the child." "[U]sually when people land from such a height, the ground's surface is rough, and the child would have abrasions . . . . [¶] But what you have in this child are contusion ecchymosis with smooth skin surface . . . ." He did not rely on defendant's statements in drawing these conclusions:

"Q. . . . First of all, strictly from the physical findings that you see in the report on this child of one-and-a-half years, do you have an opinion as to whether that type of an injury is consistent with an accidental cause?

"A. No [*sic*]. Because the injury we have to the head of this child is very severe. The head injuries were caused by the head striking a fixed object with great force and the only way you can have this kind of injury from an accidental cause would be if somebody fell from multiple stories, a great height, and even then it would have been a very forcible kind of fall."

As stated, such a fall would have caused other injuries that were absent.

The foregoing testimony was evidence independent of defendant's extrajudicial statement that a crime occurred.

To be sure, Robert Ochoa may have died following an accident. But as stated, the corpus delicti rule does not require that such a possibility be eliminated. "Rather, the foundation may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency [citation], even in the presence of an equally plausible noncriminal explanation of the event." (*People* v. *Jacobson, supra,* 63 Cal.2d at p. 327.) The evidence of trauma created a reasonable inference of criminal agency and satisfied any possible "obligation to prove the *corpus delicti—i.e.,* that the offence charged has been committed by someone . . . ." (*The King* v. *Horry* (1951) N.Z.L.R. [1952] 111, 121; see *People* v. *Cobb, supra,* 45 Cal.2d at p. 161.)

### Undue Prejudice

■ Defendant objected in essence that introducing evidence of his son's death would be substantially more prejudicial than probative (Evid. Code, § 352), indeed so prejudicial that it would violate his right, presumably under the due process clauses, to a fair trial. Citing *People* v. *Green, supra,* 27 Cal.3d 1, he complains that the trial court never expressly weighed on the record whether the evidence was unduly prejudicial, and renews his assertion that it was.

To be sure, the evidence never was introduced. But, as stated, defendant claims that even held in abeyance it prejudiced him, and that the court erred by permitting even its possible introduction.

We need not consider whether the record shows that the court exercised its duties under Evidence Code section 352. Because section 190.3 makes admissible at a capital penalty trial evidence of prior violent criminal activity, a trial court "has no discretion to exclude all evidence related to [it]." (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 68 [5 Cal.Rptr.2d 495, 825 P.2d 388].) Excluding all the evidence of his son's death is what defendant incorrectly sought.

In sum, there was no state law error. Nor was defendant's right to a fair trial violated. That the evidence was potentially damaging did not thereby make it unfairly prejudicial. (*People* v. *Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199].)

### Hampering Defendant's Ability to Present Mitigating Evidence

Next, defendant contends that by permitting the prosecution to introduce evidence that he killed Robert Ochoa, the trial court effectively precluded

him from letting the jurors hear, as previously stated "about what could only be described as the most important part of his life—that he was a loving and devoted father of two beautiful children who showed no signs of any child abuse." He appears to claim that this procedure violated state law and the federal Constitution. He also claims that the prosecution's decision to hold the evidence in reserve amounted to misconduct.

We note, as we alluded to above, that defendant does not show that such mitigating evidence existed. Plainly he cannot do so on this record, for it is the very evidence he claims he was forced to withhold.

Even if such evidence was available to him, the court committed no error in permitting the prosecution to introduce evidence of his prior violent criminal activity. Section 190.3 required it to do so, certainly after the prosecutor had shown substantial evidence of such activity. It was defendant's decision to withhold the mitigating evidence, if any there was. The trial court committed no state law error or federal constitutional violation.

Nor, for the reasons stated, did the prosecution commit misconduct. To have simply disregarded or shrugged off the evidence following the trial court's ruling would have amounted to malpractice.

### Aggravating Evidence Outside the Scope of Section 190.3

 Defendant contends that the trial court committed reversible error under section 1044, which required it to "limit the introduction of evidence . . . to relevant and material matters," and under Evidence Code section 352, when it permitted the prosecution to introduce aggravating evidence outside that permitted under section 190.3.

Defense counsel asked defendant's older sister, Arlene Cook, "Was there some age whe[n] he started to get into trouble?" Cook replied that she saw a change in him at about age 14 or 15 and "I just assumed he was getting involved . . . with gang type guys [from] the way he talked." This revelation opened the door to the issue of gang involvement. On cross-examination of Cook the prosecutor asked if defendant's clothing had changed, and she said it had. "So he was dressed like a gang member?" "Yes." "Did you assume he was then a member of a gang?" "Yes."

Counsel then asked defendant's friend Everett Sosa what defendant was like as a 12-year-old. Sosa replied that he liked a variety of sports. He then volunteered nonresponsively: "I was already involved more than he was [with] . . . gangs, young gang members and drugs and stuff." Defendant

asked Sosa which gang he was involved with. He named it and, in response to another question, said that defendant was active in the same group. On cross-examination, the prosecutor asked Sosa whether defendant engaged in various sorts of gang activity. Defendant objected that the prosecutor's line of questioning was irrelevant and, because it involved general violent conduct rather than specific instances of it, went beyond the scope of section 190.3. The court largely sustained the objections and the prosecutor ended his questioning. The court also "preclud[ed] the People from inquiring into general gang activity."

On recross-examination, however, Sosa mentioned that both his and defendant's best friends had died, and the prosecutor elicited testimony that both were shot and that one died because of gang activity.

By failing to object under Evidence Code section 352 at trial, defendant failed to preserve his present claim of error on that ground. Similarly, "[s]ection 1044 . . . does not abolish or supersede the rules of trial objection or appellate waiver." (*People* v. *Arias, supra,* 13 Cal.4th at p. 160.) It does not impose a sua sponte duty on the court to exclude evidence. (*People* v. *Medina* (1995) 11 Cal.4th 694, 727 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

The prosecutor, perhaps thinking that defendant's witness had reopened the door to questions regarding gang activity with his further testimony, disobeyed the court's prior ruling when he asked Sosa whether the deaths were related to gang activity. But defendant was required to object to the improper question so that the court could admonish the jury to disregard it and the answer. He did not, and has waived his claim. He also may be understood to claim that counsel were ineffective for failing to object to the question. We discern no prejudice, however. There is no reasonable probability that, if the jury had been admonished to disregard the question and answer, its penalty verdict would have differed.

No violation of defendant's rights under section 190.3 occurred. "[B]ecause the questions were asked of his own witness on cross-examination . . . . no notice was required." (*People* v. *Osband, supra,* 13 Cal.4th at p. 713.) Nor, we note in passing, were the questions unduly prejudicial. In sum, there was no violation of state law.

Defendant also contends that counsel were ineffective for eliciting Sosa's testimony. We address this matter *post,* at pages 468-469.

### Failing to Advise Defendant of His Right to Testify

Defendant claims that the trial court erred, apparently under state law, in failing to formally advise him of his right to testify on his own behalf. We

have rejected this argument before (*People* v. *Alcala* (1992) 4 Cal.4th 742, 805-806 [15 Cal.Rptr.2d 432, 842 P.2d 1192]), and decline to reconsider our views.

*Instruction and Argument on Sympathy for Defendant's Family*

Defendant may be understood to contend that the trial court violated his rights under the due process clauses when it (1) refused to give an instruction expressly stating that the jury could consider as a mitigating factor sympathy for his family, (2) permitted the prosecutor to argue to the jury not to consider such sympathy, and (3) forbade him to argue to the contrary.

Contrary to defendant's third contention, the court did not forbid him to argue to the jurors to take sympathy for his family into account.

At defendant's request, the jury was given this instruction: "You may take sympathy for the defendant into consideration in determining whether or not to extend mercy to the defendant." But the court deleted from the proposed written instruction the words "and his family" following the first instance of "defendant."

Another instruction that defendant requested told the jury, as relevant here: "Mitigating factors are unlimited. Anything mitigating should be considered. Mitigating factors provided in the instructions are merely examples of some of the factors you may take into account in deciding whether or not to impose a death penalty."

Another instruction told the jury, as relevant here: "You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." One of the factors was based on factor (k) of section 190.3: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

In discussing the proposed instruction, defense counsel noted that "evidence is before the jury" of "the family's emotional state and their reaction to the situation . . . ." The court agreed that this evidence existed. "But . . . the law is that the defendant should be punished based upon his individual record, his individual background and his individual involvement. That's the basis for punishing in a certain way or . . . in another way."

At summation of the case, the prosecutor urged that "sympathy for the defendant means exactly that. It does not mean sympathy for his family. It

does not mean sympathy for the victim or the victim's family.[9] [¶] Now, it's obvious that . . . some of the defendant's family members . . . . are very touched. They are very emotional. They are very hurt, and that is understandable. But your decision is not based on whether they feel bad about what happened any more than your decision can take into account the loss to the victim's family, because that is not what your job is." The prosecutor then proceeded to argue that defendant did not deserve sympathy.

In *People* v. *Cooper* (1991) 53 Cal.3d 771, 844 [281 Cal.Rptr. 90, 809 P.2d 865], we surmised that "defendant may have a constitutional right to present evidence of the effect of a death verdict on his family . . . ." Moreover, in *People* v. *Pride* (1992) 3 Cal.4th 195, 261 [10 Cal.Rptr.2d 636, 833 P.2d 643], we found no impropriety in a comment on this point by the *prosecutor*, who, in arguing for death, referred to the sympathy defendant's family deserved, in contrast to defendant himself. (See also *People* v. *Stanley* (1995) 10 Cal.4th 764, 832, fn. 32 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

Still, "[n]either the [federal] high court nor [we] yet [have] decided whether the jury may consider evidence of the impact a judgment of death would have upon the defendant's family." (*People* v. *Jones, supra,* 15 Cal.4th at p. 188 (plur. opn.); accord, *People* v. *Beeler, supra,* 9 Cal.4th at p. 991; *People* v. *Fierro* (1991) 1 Cal.4th 173, 243 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People* v. *Cooper, supra,* 53 Cal.3d at p. 844; see also *In re Visciotti* (1996) 14 Cal.4th 325, 337, fn. 3 [58 Cal.Rptr.2d 801, 926 P.2d 987].) We shall now resolve the point.

State law requires the jury to take into account matters relevant to the penalty determination. "[S]ection 190.3 provides that, with narrow exceptions, 'evidence may be presented by both the people and the defendant as to *any* matter relevant to aggravation, mitigation, *and sentence* including, but not limited to' the circumstances of the current offense, prior felony convictions or violent crimes, 'and the defendant's character, background, history, mental condition and physical condition.' (Italics added.) In deciding whether the aggravating circumstances outweigh the mitigating, the jury must consider, among other things, 'all of the evidence' and 'the arguments of counsel.'" (*People* v. *Brown* (1985) 40 Cal.3d 512, 542 [230 Cal.Rptr. 834, 726 P.2d 516], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [107 S.Ct. 837, 93 L.Ed.2d 934].)

---

[9]The case was tried before the United States Supreme Court held, in *Payne* v. *Tennessee* (1991) 501 U.S. 808 [111 S.Ct. 2597, 115 L.Ed.2d 720], that "the jury could consider evidence of the characteristics of the victim and the impact of the crime on the victim's family." (*People* v. *Jones, supra,* 15 Cal.4th at p. 188 (plur. opn.).) Prior to *Payne,* such evidence could not be considered. (*Booth* v. *Maryland* (1987) 482 U.S. 496, 501-502 [107 S.Ct. 2529, 2532-2533, 96 L.Ed.2d 440].)

In this context, what is ultimately relevant is a defendant's background and character—not the distress of his or her family. A defendant may offer evidence that he or she is loved by family members or others, and that these individuals want him or her to live. But this evidence is relevant because it constitutes indirect evidence of the defendant's character. The jury must decide whether the defendant deserves to die, not whether the defendant's family deserves to suffer the pain of having a family member executed.

For example, a jury may take into account testimony from the defendant's mother that she loves her son if it believes that he must possess redeeming qualities to have earned his mother's love. But the jury may not spare the defendant's life because the jury feels sorry for the defendant's mother, or believes that the impact of the execution would be devastating to other members of the defendant's family.

Here, the proffered instruction simply would have invited the jury to consider in mitigation sympathy for defendant's family. The jurors could have interpreted it to mean that if they wished to spare defendant's family the emotional distress of execution, they could return a verdict of imprisonment. That, as the trial court correctly noted, would not have properly stated the law, which requires an individualized assessment of the defendant's background, record, and character, and the nature of the crimes committed, both as a matter of state law (§ 190.3; see *People* v. *Beeler, supra,* 9 Cal.4th at pp. 991-992; *People* v. *Fudge* (1994) 7 Cal.4th 1075, 1124 [31 Cal.Rptr.2d 321, 875 P.2d 36]) and as a federal constitutional requirement (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 303-305 [96 S.Ct. 2978, 2990-2992, 49 L.Ed.2d 944] (plur. opn.) [speaking of character and record and relying on the Eighth and Fourteenth Amendments to the United States Constitution]). Hence the court did not violate either state law or the due process clauses by failing to give the requested instruction. "[A] State [may] not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty." (*Penry* v. *Lynaugh* (1989) 492 U.S. 302, 318 [109 S.Ct. 2934, 2946-2947, 106 L.Ed.2d 256]; accord, *id.* at p. 328. [109 S.Ct. at pp. 2951-2952].) The court's ruling did not have this effect.

 In summary, we hold that sympathy for a defendant's family is not a matter that a capital jury can consider in mitigation, but that family members may offer testimony of the impact of an execution on them if by so doing they illuminate some positive quality of the defendant's background or character. Nothing contrary to these principles occurred at trial.

### Failing to Instruct on Meaning of Life Imprisonment Without Parole

Defendant did not seek an instruction on the meaning of life imprisonment without possibility of parole. ■■■ Nevertheless, he contends that the court committed reversible error in not giving such an instruction.

The court did, of course, instruct the jurors that they must decide which penalty to impose: "death or confinement in the state prison for life without possibility of parole . . . ."

"We have previously rejected the point, and do so again: 'When a term is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request. [Citation.] In this case, the term "confinement in the state prison for life without possibility of parole" was used in the common and nontechnical sense that the plain meaning of the words convey. Accordingly, the court was not required to give an instruction as to its meaning sua sponte.' " (*People* v. *Sanders* (1995) 11 Cal.4th 475, 561-562 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

Defendant also claims that counsel were ineffective for failing to seek such an instruction. We disagree. Counsel were not required to seek an instruction defining the meaning of a term that the jurors could readily understand. He does not point to any place in the record that shows that a juror did not understand the meaning of the term. Such confusion presumably would have been revealed during individual voir dire on jurors' views of the propriety of the death penalty.

### Instructing on Totality of Factual Circumstances

■■■ At defendant's request, the court instructed the jury: "In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." He asserts that this instruction caused the jurors not to understand that the presence of a single mitigating factor would permit them to vote for a verdict of imprisonment. Giving the instruction, in his view, violated the Eighth Amendment to the United States Constitution and requires reversal of the penalty judgment.

We cannot agree. First, as a procedural matter, defendant requested the very instruction to which he now objects. This bars any claim of error on review, for he cannot invite it by his own actions. "[W]hen the trial court

accedes to the defendant's wishes, the defendant may not argue on appeal that in doing so the court committed prejudicial error, thus requiring a reversal of the conviction." (*People* v. *Barton, supra,* 12 Cal.4th at p. 198.)

In any event, the court did not err in giving the instruction. Addressing the same claim in *People* v. *Berryman* (1993) 6 Cal.4th 1048 [25 Cal.Rptr.2d 867, 864 P.2d 40], we held: "There is no reasonable likelihood that the jury misconstrued or misapplied the challenged instruction in violation of the Eighth or Fourteenth Amendment to the United States Constitution or any other legal provision or principle." (*Id.* at p. 1100.)[10] We decline to reconsider our conclusion.

### Instructional Claims Relating to Aggravation and Mitigation

Contrary to defendant's claims, the court did not err by failing to instruct which factors were aggravating and which mitigating (*People* v. *Osband, supra,* 13 Cal.4th at p. 705), or by failing to define aggravation and mitigation (*ibid.*). Nor, contrary to his further claim, were counsel ineffective for failing to seek such instructions: he was not entitled to them in any event.

### Applicability of Guilt Phase Instructions at Penalty Phase

As stated, the trial court instructed the jury to consider in mitigation "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." It then told the jury: "You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle."

 Defendant requested these instructions. He now complains that by instructing the jury to disregard certain guilt phase instructions, the court implied that they should apply all others, and thereby erred under state law. "For instance," he speculates, "the jury may have thought that the defense bore the burden of proving mitigating factors beyond a reasonable doubt or that pity and prejudice as well as sympathy were not legitimate factors for the jury to consider."

This contention is meritless. Defendant leverages his claim with the language he requested instructing the jury to disregard certain guilt phase

---

[10]*Berryman* was overruled on another point by *People* v. *Hill, supra,* 17 Cal.4th at page 823, footnote 1.

instructions. He invited any error and may not raise it now. Moreover, his claim is based on pure speculation. We see no reasonable likelihood (*People* v. *Clair, supra,* 2 Cal.4th at p. 663) that the instructions misled the jurors into thinking they should apply various guilt phase instructions to defendant's detriment. And *People* v. *Arias, supra,* 13 Cal.4th at page 171, broadly rejects the notion that the quoted language would mislead jurors about their sentencing task. Finally, there is no reasonable likelihood that the jury would understand the instructions to mean it could consider sympathy for defendant but not pity. Pity and sympathy are essentially synonymous (*People* v. *Howard* (1988) 44 Cal.3d 375, 434 [243 Cal.Rptr. 842, 749 P.2d 279]), at least as the terms would apply in this context. For this last reason, counsel were not, contrary to defendant's further claim, ineffective for failing to seek better and more favorable instructions—those provided were adequate.

### *Failing to Instruct on Pity*

Defendant contends in sum that the trial court violated the Eighth and Fourteenth Amendments to the United States Constitution by failing to instruct, sua sponte, that the jurors could consider pity in deciding which sentence to impose.

We do not agree. As described, the jury was instructed that it could consider sympathy and mercy. It could only have understood the instructions as allowing it to consider pity. (See *People* v. *Caro* (1988) 46 Cal.3d 1035, 1067 [251 Cal.Rptr. 757, 761 P.2d 680] [instructing on sympathy permitted jury to consider mercy].) As stated, pity and sympathy are essentially synonymous in this context. No federal constitutional guaranty was violated.

For the foregoing reason, and contrary to defendant's further claim, counsel were not ineffective for failing to seek an instruction on pity.

### *Failing to Instruct on Remorse and Potential for Good Behavior*

Defendant contends that the court erred under state law by failing to instruct, sua sponte, that the jury could consider his remorse in mitigation.

We disagree. As stated, the jury was instructed to consider "[a]nything mitigating . . . ." At the penalty phase, defendant introduced evidence of his remorse and mentioned this quality in his opening statement and his closing argument. We see no reasonable likelihood that the jury would believe that it could not consider his remorse. The court did not err.

For the foregoing reasons, we reject defendant's further claim that counsel were ineffective for failing to seek an instruction on remorse. As stated, they

steeped the jury in the issue of remorse throughout the penalty phase, and the instructions authorized the jury's consideration of that topic.

We also reject defendant's state law claim that the court erred in failing to instruct, sua sponte, that the jury could consider his potential to be a well-behaved and productive prisoner if sentenced to imprisonment. He introduced evidence on this matter, and there is no reasonable likelihood, given the instructions the jury received, that it would believe that it could not consider this factor. The court did not err. Nor, contrary to defendant's further claim, were counsel ineffective for failing to seek an instruction on the point. The jury was aware of the evidence of his potential for future good behavior and the instructions authorized it to consider the matter in mitigation.

### Reviewing Court's "Reweighing" the Evidence

Defendant contends that "numerous invalid aggravating factors permeated the penalty phase," including his "fighting with his father, his history of drug abuse, his lack of mercy that he showed the victim, and, finally, the lack of credibility of his statement to the police." He maintains that if we agree with him, we may not "reweigh the aggravating and mitigating factors and impose whatever penalty [we feel] is appropriate . . . ." To do so, in his view, would be to violate the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and various state constitutional guaranties.

We do not propose to engage in any reweighing process. Moreover, we do not agree with defendant's premise. He does not show that the jury improperly relied on any evidence for purposes of finding aggravating circumstances. There neither was nor is a violation of any constitutional or other legal principle.

### Automatic Motion to Modify the Verdict

Subdivision (e) of section 190.4 provides: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to Subdivision 7 of Section [1181]. In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

"Pursuant to section 190.4, in ruling upon an application for modification of a verdict imposing the death penalty, the trial court must reweigh independently the evidence of aggravating and mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict." (*People* v. *Crittenden, supra,* 9 Cal.4th at p. 150.)

" 'On appeal, we subject [the] ruling . . . to independent review.' [Citation.] 'Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty.' " (*People* v. *Berryman, supra,* 6 Cal.4th at p. 1106.)

The court followed the foregoing requirements in deciding the motion. Defendant's contrary contentions are without merit.

First, defendant asserts that the court improperly considered in aggravation his abuse of drugs. We disagree. The court commented on this fact in the context of explaining a finding of mitigation.

The court listed various items of evidence that it found to be mitigating as "other circumstance[s] which extenuate[] the gravity of the crime" (§ 190.3, factor (k)). It listed defendant's remorse, his successful trustyship in jail, his potential to be a good prisoner, and his addiction to cocaine, "the most addictive drug."

The court, continuing to consider the mitigating evidence, then commented: "Family members testified that they loved the defendant, his mother, his wife, and I believe them. His sisters, step-sisters, natural sister, his wife. But they all gave us a picture of a Lester Ochoa as a pleasant young person, sports-minded loving person who started using drugs that escalated to the point that in the last several years he was belligerent, abusive verbally and sometimes physically. He was described as being mean. This was all when he was under the influence of drugs. Apparently, he's a totally different person if he's not under the influence of drugs. He was unable to control his use of drugs. His family relationship deteriorated to the point that they feared him and they dreaded being around him when he would go on his binges, so to speak. And we were told of his habit when he was on his binges of going out late in the evening and walking the streets[,] which is not evidence in the penalty phase but certainly corroborates many of the things that we heard during the guilt phase."

The court regarded all of the foregoing facts as extenuating. It began its discussion of factor (k) of section 190.3 by so stating. And the rest of its

discussion shows that it was considering mitigating evidence. Defendant complains of the court's references to his "binges," but only in isolation could the reference or surrounding words be considered derogatory. The court was explaining that it found mitigating the evidence that cocaine is the most addictive drug, that defendant could not control his abuse of it, and that when not intoxicated by it he was not the cruel individual he became at other times.

Second, defendant maintains that the court improperly considered in aggravation his incredible explanation, during the hearing *in limine* to suppress his confession, of the events surrounding Chandler's killing. (*Ante*, at p. 398.) His argument is purely speculative. The court interrupted its discussion of its findings on his automatic application to modify the verdict to comment on another reason for denying defendant's new trial motion, which was an entirely separate matter. (*Post*, at pp. 475-476.) The record does not either show or imply that the court confused the application to modify the verdict with the motion for a new trial.

Defendant claims that the court's errors violated state law and the Eighth Amendment to the United States Constitution. But as we have explained, the court committed no error. Neither state law nor the federal Constitution was violated.

### Prosecutorial Misconduct

Defendant claims that the prosecutor repeatedly violated state law by his misconduct during the penalty phase. We discuss each claim in turn.

### In Examining Witnesses

Defendant complains that the prosecutor improperly asked defendant's expert witness James Park about the prevalence of drugs in prison, thus implying that he would be consuming them. The prosecutor did ask questions on this topic, but defendant did not object to them and has failed to preserve his claim of error on appeal. In any event, no misconduct occurred. An aspect of the penalty phase defense was that when not on drugs defendant was well behaved, and only when intoxicated was he different. Defendant also solicited Park's opinion that he would be a good prisoner. The prosecutor was entitled to inquire whether drugs might be available in prison so as to cast doubt on that testimony.

Next, defendant complains that the prosecutor improperly raised the subject of his future dangerousness in prison by asking Park about the number

of assaults that occur there. The prosecutor did ask questions on this topic, but defendant did not object to them and has failed to preserve his claim of error on appeal. In any event, no misconduct occurred. Even if "the prosecution is prohibited from offering expert testimony predicting future dangerousness in its case-in-chief [citation], it may explore the issue on cross-examination or in rebuttal if defendant offers expert testimony predicting good prison behavior in the future." (*People* v. *Morris* (1991) 53 Cal.3d 152, 219 [279 Cal.Rptr. 720, 807 P.2d 949].)[11]

Defendant also complains that the prosecutor improperly focused the jurors' minds on the possibility of future release from prison by asking Park about the early release system at the California Youth Authority, where defendant had been confined. The prosecutor did ask questions on this topic, but defendant did not object to them and has failed to preserve his claim of error on appeal. In any event, no misconduct occurred. Park was testifying that defendant would not be disruptive in prison. He based that view on defendant's behavior at the Youth Authority. The prosecutor was asking if there was an incentive—early release—to behave well in the juvenile system, an incentive that defendant would not have if imprisoned for the rest of his life. This was proper questioning.

In a related claim, defendant contends that he received the ineffective assistance of counsel when they failed to object to these questions. We disagree. Representation does not become deficient for failing to make meritless objections. There was no misconduct, so no reason to object to the questions.

### During Closing Argument

In reviewing defendant's claims, we bear in mind that there is a "wide range of permissible argument at the penalty phase." (*People* v. *Osband, supra*, 13 Cal.4th at p. 703.) The prosecutor's beliefs must be based on the evidence presented at trial (*People* v. *Thomas* (1992) 2 Cal.4th 489, 529 [7 Cal.Rptr.2d 199, 828 P.2d 101]), but as long as they are, he or she may argue emotionally and vividly (as may defense counsel), using terms that might be thought melodramatic or theatrical. We have declined to find misconduct even in vehement argument. (*Id.* at p. 537 [No misconduct in "prosecutor's use of the epithets 'mass murderer, rapist,' 'perverted murderous cancer,' and 'walking depraved cancer' in referring to defendant during closing arguments."].)

Defendant contends that the prosecutor conducted himself improperly, and violated state law, by arguing that his drug usage was an aggravating factor. We do not agree.

---

[11]*Morris* was overruled on another point by *People* v. *Stansbury, supra*, 9 Cal.4th at page 830, footnote 1.

The jury was instructed that in deciding the penalty it could consider "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication."

The prosecutor conceded in his closing argument that if the jury agreed that defendant "couldn't appreciate what he was doing, he couldn't conform his conduct to the law," it should spare his life. But he argued that there was no evidence of such impairment; rather, defendant exercised his ability to reason and acted with deliberation. The prosecutor argued—and this is the material that defendant finds objectionable—that he used his drug addiction as an excuse for various incidents of misconduct.

"Setting aside the fact that defendant failed to preserve the point for review when he failed to [object] to the prosecutor's remarks [citation], it is evident that the prosecutor was not arguing that intoxication 'at the time of the offense' [citation] was an aggravating factor. . . . [¶] Defendant presented evidence of increasing drug use as he progressed through his adolescence and offered that evidence in mitigation. At closing argument the prosecutor countered [as described]." (*People* v. *Osband*, *supra*, 13 Cal.4th at p. 706.) Nor was the prosecutor improperly "imply[ing] that mere absence of mitigating evidence is aggravating." (*People* v. *Williams*, *supra*, 16 Cal.4th at p. 270.) To be sure, factor (h) of section 190.3, which requires a jury to consider, if relevant, "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the [e]ffects of intoxication," could only be considered in mitigation. (*People* v. *Holt*, *supra*, 15 Cal.4th at p. 696.) Nevertheless, there was nothing improper in this argument—that is, there is no "reasonable likelihood [citation] that the jury would have understood him to mean that intoxication 'at the time of the offense' [citation] could be considered as a factor in aggravation. . . . Again and again he questioned whether defendant was [sufficiently] intoxicated at the time of the crimes" (*People* v. *Osband*, *supra*, 13 Cal.4th at p. 708) to be able to invoke factor (h) of section 190.3 in his favor. The prosecutor merely, and properly, argued that defendant knew what he was doing and that, despite his evidence of the ruinous effects of drug usage on him, was not impaired at the time of the crimes in a manner that might bring factor (h) to his aid. He did not violate state law.

 The prosecutor urged the jury to "show [defendant] the same mercy that he showed Lacy Chandler"—presumably none. Defendant did not object

to this remark, and has failed to preserve his claim of misconduct on appeal. In any event, this was proper argument. The jury was instructed that it could show mercy or sympathy. The prosecutor was arguing that he did not deserve it, given the circumstances of the crime (§ 190.3). There was no violation of state law. To be sure, other jurisdictions reflect various views on this question. (Compare *Com.* v. *Pelzer* (1992) 531 Pa. 235, 252 [612 A.2d 407, 416] (prevailing opinion of equally divided court) [Proper for prosecutor to argue that "the jurors should 'show [the defendants] the same mercy they showed Alexander Porter.' "] with *Duvall* v. *Reynolds* (10th Cir. 1998) 139 F.3d 768, 795 [jury instructed to consider mercy; nevertheless improper for prosecutor to argue, "in this case you may find that only those who show mercy shall seek mercy, and that as a verdict of this jury, that you may show him the same mercy that he showed Karla Duvall"]; *Rhodes* v. *State* (Fla. 1989) 547 So.2d 1201, 1206 ["urging the jury to show Rhodes the same mercy shown to the victim on the day of her death . . . . was an unnecessary appeal to the sympathies of the jurors"].)

Defendant complains that it was improper for the prosecutor to comment, "I believe the death penalty is proper." The prosecutor never made the remark.

Defendant complains that the prosecutor improperly argued that the effects of cocaine wear off quickly and therefore defendant knew what he was doing when he killed Chandler. He contends no such fact was in evidence. He did not object to this remark, and has waived his claim of misconduct on appeal. In any event, this was proper argument. Defendant's friend Allan Figueroa provided evidence that defendant consumed cocaine both through the nose and intravenously. Everett Sosa testified that defendant would inject the substance into his leg, and implied that he only consumed it by injection. Dr. Gorelick testified that the effects of injected cocaine "wear off relatively rapidly, probably between within 30 and 45 minutes, coming down from the acute effects."

Defendant maintains that the prosecutor interjected his personal belief rather than arguing from the evidence when he argued, "I don't see any sympathy. If there is, I would argue it would be very minimal." He did not object to this remark, and has waived his claim of misconduct on appeal. In any event, this was proper argument. The prosecutor was arguing that in light of the evidence that defendant spurned his family's support in favor of a life of crime and drugs, he was not entitled to sympathy.

Defendant asserts that the prosecutor improperly argued that "here is a guy who fights with his family, spits in his wife's face, shoves them around,

throws a knife at his father . . . ." First, he maintains that the record shows no evidence to support the mentions of knife throwing and spitting. But he is mistaken. His younger sister, Sharon Ochoa, did testify that he threw a knife at his father. His wife did testify that he spat in her face. Next, he asserts that the references were unduly inflammatory and relied on evidence not within any aggravating factor. We disagree: they were fair comment on the testimony given at the penalty phase—testimony to which he did not object when the prosecutor elicited it.

Defendant also claims that the prosecutor committed misconduct by failing to disclose jailhouse informants' evidence about Ramage's involvement in Chandler's murder. (*Post*, pp. 470-472.) The prosecutor explained, however, during argument on the new trial motion, that he was unaware of the evidence. He cannot be found to have committed misconduct on the basis of evidence that he did not possess. "[T]he record fails to establish deception or unfair surprise." (*People* v. *Arias*, *supra*, 13 Cal.4th at p. 151.)

 We agree with defendant that the prosecutor should not have argued that his clean record while incarcerated at a California Youth Authority facility might only "mean that he didn't get caught." Argument must proceed from facts for which there is evidence, or inferences from those facts. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 283 [266 Cal.Rptr. 834, 786 P.2d 892].) There was no evidence of misconduct at the California Youth Authority to justify any inference of the kind the prosecutor made. But again, defendant did not assign misconduct to this remark, and has failed to preserve his claim of error on appeal. Nor were counsel ineffective for failing to object to the remark: there is no reasonable probability that had they done so, the outcome of the penalty phase would have been different.

### Cumulative Effect of Misconduct

Finally, defendant urges that the cumulative effect of misconduct resulted in a miscarriage of justice under state law (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), requiring reversal of the penalty judgment. We disagree. Aside possibly from the gang involvement question, the sole instance of misconduct we have found is that described immediately above—the prosecutor's speculation about defendant's behavior at the California Youth Authority. The improper reference was trivial. There is no reasonable probability that the outcome would have differed had the jury not heard it. (*Ibid.*)

### Ineffective Assistance of Counsel

Throughout our discussion of the penalty phase, we have addressed claims of ineffective assistance of counsel. We turn to additional such claims in this part. We find none to have any merit.

*Failing to Challenge Request to Exclude Evidence of Remorse*

██ The prosecution moved *in limine* to exclude as inadmissible hearsay any statements defendant might have made to his family about remorse or the crimes themselves. Counsel told the court they did not intend to call family members for that purpose. Defendant claims they were ineffective for not doing so.

We disagree. Counsel could reasonably have concluded after a reasonable investigation that family members would have nothing to say about defendant's statements that would benefit him, and made a tactical decision not to ask them about them. The statements the record shows defendant made to his family were those on the night of his arrest, when, already in custody, he told them he had killed Chandler and accused them of not getting him psychological help. Detective White provided the statements at the *in limine* hearing to suppress the confession: "Lester told them that he had confessed to us and that he needed help and that somebody had got hurt, and that he'd killed a girl, and that we, meaning the police, had promised him that it would not be in the papers." "[W]hen I allowed him to see his family, he didn't ask a question. He actually made a[n] accusation to his mother . . . 'I needed help'—or 'I told you I needed help and someone got hurt.'" Counsel reasonably could have concluded that presenting this testimony to the jury would reinforce the jurors' possible perception of defendant as spoiled, self-centered, and self-indulgent, thus harming his case further. Defendant's father, Jim Ochoa, also testified at the *in limine* hearing that his son told them that the police had tricked him into confessing. Counsel could reasonably have found this statement unhelpful to the jury in determining punishment. On this record we find no ineffective assistance of counsel.

Defendant further maintains that he received the ineffective assistance of counsel when they failed to seek an instruction that his statements to his family showed his remorse. He may never have made such statements, however, or counsel may reasonably have concluded that they were unhelpful in general. On this record it cannot be said that they performed deficiently. It is not deficient to fail to seek an instruction when the sole basis for it would be evidence that counsel could reasonably have chosen not to introduce.

*Failing to Challenge Prosecutor's Argument of Lack of Remorse*

Defendant claims that counsel were ineffective for failing to object to the prosecutor's argument that his lack of remorse should be considered in aggravation.

We disagree with his factual premise. "In fact, the prosecut[or] did not . . . argue lack of remorse as a factor in aggravation of penalty. The record reveals no prosecutorial reference linking 'remorse' (or its lack) and 'aggravation.' Having reviewed the relevant portions of the record, we agree with the People that [his remarks] were simply comment on the absence of remorse as a mitigating factor, such as we repeatedly have held proper." (*People* v. *Williams, supra,* 16 Cal.4th at p. 254, fn. omitted.)

### *Eliciting Friend's Testimony That Defendant Was a Gang Member*

As described, defense counsel asked defendant's friend Everett Sosa what defendant was like as a 12-year-old. Sosa replied that he liked a variety of sports. He then volunteered nonresponsively: "I was already involved more than he was [with] . . . gangs, young gang members and drugs and stuff." Counsel asked Sosa which gang he was involved with. He named it and, in response to another question, said that defendant was active in the same group. On cross-examination, the prosecutor asked Sosa whether defendant engaged in various types of gang activity.

Defendant claims that the foregoing manifested ineffective assistance of counsel.

Sosa's testimony reveals the risks inherent in deciding what mitigating evidence of background and character to present on behalf of a defendant whose background and character have been unsavory in significant respects. The strategy runs the risks of unanticipated and harmful testimony on direct examination and damaging cross-examination or rebuttal. Both risks were realized here. "What to offer as mitigating evidence may depend on what the prosecution can be expected to present in rebuttal of that evidence. Thus . . . there may be tactical reasons for a defense attorney not to present certain witnesses, or not to offer evidence of particular incidents in the defendant's life or particular traits of the defendant's character." (*In re Ross* (1995) 10 Cal.4th 184, 225 [40 Cal.Rptr.2d 544, 892 P.2d 1287] (dis. opn. of Kennard, J.); see *People* v. *Miranda* (1987) 44 Cal.3d 57, 118-123 [241 Cal.Rptr. 594, 744 P.2d 1127].) By the same token, however, there may have been reasonable tactical reasons for counsel's stated strategy in this case, which was to present a whole picture of defendant's background, even if it incurred the risks that were realized. Virtually every one of defendant's witnesses presented testimony unfavorable to him. But counsel could have reasonably concluded that mitigating evidence was available and decided to proceed with a risky defense because, as they might have reasoned, "the availability of rebuttal evidence [could not] justify a defense attorney's decision to present no mitigating evidence at all" (*In re Ross, supra,* 10

Cal.4th at p. 225 (dis. opn. of Kennard, J.)), or extremely little evidence, under these circumstances.

■ Nevertheless, we agree with defendant that there could be no reason, once Sosa had revealed defendant's prior gang involvement, to ask him for the name of the gang in which defendant was active. The People concede that defendant's counsel "asked one question too many when he inquired whether [defendant] was also involved" in Sosa's gang. Assuming that asking this question constituted deficient performance, however, we conclude that no prejudice arises from the mistake: the picture painted of defendant's crimes, background, and record was sufficiently grim that there is no reasonable probability of a more favorable outcome had this question not been asked.

### Quality of Closing Argument

■ Defendant claims that the closing argument counsel made in his behalf was inadequate and that he suffered prejudice from it. We disagree.

First, he claims that the argument was too brief. It was brief, but we have held that "brevity and eloquence are not necessarily inconsistent" (*People* v. *Mayfield, supra,* 5 Cal.4th at p. 186), and that is true here: the argument was, in our view, persuasive in principle given the weakness of the mitigating evidence and the strength of the aggravating evidence.

Second, he claims that the argument foolishly acknowledged that he "consciously chose to become part of the drug culture." After so stating, though, counsel continued: "He chose to become a user of drugs, but I don't think he chose . . . to become a drug addict." Counsel was trying to say that he made a bad choice as a youth and then found himself unable to overcome it. It was a reasonable tactical choice to present this candid argument, and it was presented as a justification for leniency.

In sum, defendant seizes on isolated words or phrases to assert his claim. Having reviewed the record as a whole, including the closing argument, we are satisfied that the latter was not constitutionally deficient.

### Failing to Argue at the Application to Modify the Penalty Verdict

■ Finally, defendant claims that counsel were ineffective for failing to make an argument before the court ruled on his automatic application to modify the death verdict. It is true that they did not do so; neither did the prosecutor. Nor, according to the clerk's transcript before us, did counsel

submit any papers on defendant's behalf. We cannot condone these omissions—this was an opportunity to spare defendant his death sentence, and counsel took no advantage of it. Despite this probably deficient performance, however, there was no ineffective assistance of counsel. Our reading of the record assures us that the trial court was highly engaged in all aspects of this case, presided over the trial very actively, and was thoroughly familiar with the facts the parties had already brought out during the penalty phase. On this record we cannot say that that there was much to add to what counsel had already presented, given the trial court's degree of conscientious engagement. We see no reasonable probability of a different outcome had counsel also been more engaged on the matter of the application to modify the verdict.

### Cumulative Effect of Ineffective Assistance of Counsel

Finally, defendant contends that the cumulative effect of instances of ineffective assistance of counsel requires reversal of the penalty judgment, both as a matter of federal constitutional law and state law. But we have found no instances of ineffective assistance of counsel at all, either in this section or elsewhere in our discussion of the topic at the penalty phase, and therefore the predicate for his claim is absent.

### OTHER CLAIMS

### Claims Regarding Denial of New Trial Motion

#### Substantive Claims

Following his sentence, defendant formally moved for a new trial on numerous grounds, though he litigated only two. On appeal he raises claims on the basis of those two grounds: that newly discovered evidence required a new trial, as did the prosecution's failure to disclose potentially exculpatory information. Both of these claims are premised on two jailhouse informants' statements asserting that Ramage participated in Chandler's murder, and the live testimony of the informants and others.

The trial court held a lengthy hearing on the motion, a "major issue" of which defense counsel described as being the prosecution's withholding "evidence [that] showed there was more than one perpetrator . . . ."

Richard Slawinski submitted a written statement that, according to Ramage, he supplied the victim with cocaine and she became intoxicated. She tried to escape, but Ramage held her legs and defendant stabbed her until she

stopped screaming. He testified that he and Ramage were housed on the same tier of the Los Angeles County jail. Ramage told him that he and another were involved in a homicide. Ramage added that the homicide involved a young girl and took place at a school called "Flanner." Slawinski relayed Ramage's information to Sergeant Richard Valdemar.

On the prosecution's cross-examination, Slawinski acknowledged that he was a known informant and that he had spoken to Valdemar regarding 10 to 20 criminal cases. He testified that Ramage had told other inmates about his involvement in a murder, and that he, Slawinski, talked to defendant about the case on one occasion. Ramage told him that he witnessed defendant stabbing Chandler some 20 times. Ramage also told him that he, defendant and Chandler all had consumed cocaine. Slawinski could provide few other details of the events, however, despite claiming to have talked to Ramage 40 to 50 times about the murder. He claimed that he did not want to hear Ramage's story and did not elicit the details from him. He denied asking Valdemar for any benefits in exchange for informing on other criminals. (The prosecution impeached a denial by Slawinski that he had sought benefits for information he gave to the Pomona Police Department with evidence that he wanted to avoid a prison sentence in exchange for it and obtained a plea agreement.)

White testified that Valdemar called him with Slawinski's information, but that he discounted it heavily because the physical evidence and defendant's confession left him "thoroughly convinced that there is no second suspect," and because such information, in his experience "over the years . . . has been highly inaccurate . . . ." He also declared it "inconceivable to me that Ramage would inform on Ochoa and then Ochoa[,] when given a wonderful opportunity to lay this off on a second party when I interviewed him, . . . didn't." He could not recall disclosing Slawinski's information to anyone, and thought that he probably did not do so.

Willie Ray Battle submitted the other written statement implicating Ramage in the murder. The statement described Ramage and defendant raping "a young girl, about 15" at the place of a prior rape, and defendant stabbing her to death. Battle testified that he had made statements concerning thirteen murder cases, had testified in seven, was preparing to testify in two others, had been an informant since 1975, and had suffered nine convictions, the earliest causing his commitment to state prison in 1961. He did not disagree with an estimate that he had provided information a hundred times or more. He candidly acknowledged that he expected "consideration in matters that I was faced with" and was still faced with at the time of his testimony for giving truthful statements against Ramage, whom he called a "sick man." He

testified that Ramage was among the smallest men on the 36-man tier, and would be treated cruelly and beaten by other inmates, even though that tier had "no tough guys because all of the tough guys are on the main line. Everybody where I'm at is cowards and snitches." In his written statement, Battle said that Ramage "has a complex, a small guy's complex because he's so short. He goes crazy when teased about his height. He slams things in his cell and breaks them."

In Battle's written statement, he described asking Ramage " 'Why are you telling me all this?['] He says [']because I hear you won't snitch on another snitch. And I got to tell *somebody*. I'm sorry for what I did. I hope God will forgive me.' "

Defendant's investigator, Gordon Zbinden, who had 17 years' law enforcement experience, some of which included investigating homicides, testified that on February 22, 1988, he gave the prosecutor of this case, Gary Hearnsberger, his opinion that the physical evidence showed 2 people killed Chandler.

Dennis Austin testified that Ramage told him he and defendant were "partying, getting high on coke" with a 16- or 17-year-old at an elementary school in La Puente. They intended to have sex with her. She panicked and tried to run. Ramage grabbed her feet and defendant stabbed her. Afterward her shirt was inside out. Austin called the Baldwin Park police to report this information, but was told the case was already being resolved.

Austin confirmed that the day of his testimony he was sentenced to 16 years in prison for burglary. He gave varying answers to questions whether he was seeking any kind of consideration in exchange for his testimony, but admitted that he called the Baldwin Park police hoping for a reduced sentence.

The prosecution called Ramage as a witness to reaffirm that he was not involved in the crimes against Chandler. He testified that Slawinski was his cellmate at the county jail and Battle was in an adjoining cell. He sought their advice regarding the legal proceedings. He told them about his participation in the assault on Charlotte J., asking whether he could reduce his sentence for that attack. He told them that he was testifying against defendant, but that he had no involvement in the crimes against Chandler. Aquino had told him that a person had been stabbed at Florence Flanner School and died, and he relayed that information to Slawinski and Battle. He variously recalled having been told that Chandler had been stabbed some 21 or 23 times.

After argument on the motion, the trial court ruled, as relevant here, beyond a reasonable doubt that there was no probability that the newly discovered evidence—the informants' testimony—would have resulted in a different verdict. Whatever the effect on Ramage's culpability or his credibility, the informants' testimony would only have corroborated defendant's confession that he raped and killed Chandler. It also ruled that, though the state should have disclosed the evidence to defendant, there was no due process violation. Two of the three witnesses testified that Ramage told them Chandler was using cocaine, but the post mortem evidence showed no trace of the substance, and there was only one kind of recognizable shoe print in the area, of a type consistent with defendant's shoes.

■■■ We review the rulings on defendant's motion to order a new trial for abuse of discretion. (*People* v. *Jones*, *supra*, 17 Cal.4th at p. 317.) Plainly there was no abuse of discretion in either case.

To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial. (*People* v. *Beeler*, *supra*, 9 Cal.4th at p. 1004.) The trial court did not abuse its discretion in holding, as it did, that there was no probability of a different result. In fact the witnesses would only have corroborated defendant's confession (as the jury evidently interpreted it) that he kidnapped, raped, and personally killed Chandler.

In addition, the prosecution has a due process duty under the Fourteenth Amendment to the United States Constitution to disclose certain evidence to a defendant. (See, e.g., *United States* v. *Bagley* (1985) 473 U.S. 667, 674-677 [105 S.Ct. 3375, 3379-3381, 87 L.Ed.2d 481].) But the evidence must be both "favorable" to the defendant and " 'material' " to either guilt or penalty. (*Id.* at p. 674 [105 S.Ct. at p. 3379].) Favorable evidence is evidence that the defense could use either to impeach the state's witnesses or to exculpate the accused. (*Id.* at p. 676 [105 S.Ct. at p. 3380].) "*Bagley* held that . . . favorable evidence is material, and constitutional error results from its suppression . . . , 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*Kyles* v. *Whitley* (1995) 514 U.S. 419, 433-434 [115 S.Ct. 1555, 1565, 131 L.Ed.2d 490].) A "reasonable probability" is one sufficient to "undermine[] confidence in the outcome." (*United States* v. *Bagley*, *supra*, 473 U.S. at p. 678 [105 S.Ct. at p. 3381].)

For the reasons stated, there is no reasonable probability that the informants' evidence would have resulted in a different outcome regarding defendant's guilt. Whether or not it was favorable—i.e., was usable for

impeachment—it was not material either as to guilt or penalty. It would have *reinforced* the evidence against him. As the prosecutor pointed out during argument on the motion, it would have been malpractice for defense counsel to have presented it. There was no due process violation.

At oral argument, defendant emphasized our recent decision *In re Brown* (1998) 17 Cal.4th 873 [72 Cal.Rptr.2d 698, 952 P.2d 715]. *Brown* holds that the materiality test "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." (*Id.* at p. 886, quoting *Kyles* v. *Whitley, supra,* 514 U.S. at p. 434 [115 S.Ct. at p. 1566].) Defendant contended in sum at oral argument that the trial was not fair under the reasoning of *Brown,* because the police had an informant's impeachment evidence and failed to disclose it.

We agree, however, with the People's response: what occurred was a discovery violation, not a due process violation. As the trial court ruled, the informants' evidence should have been disclosed. But "due process concerns itself with the fairness of the trial as a whole." (*People* v. *Pope* (1979) 23 Cal.3d 412, 423 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; accord, *In re Gaines* (1965) 63 Cal.2d 234, 237 [45 Cal.Rptr. 865, 404 P.2d 473]; see also *Greer* v. *Miller* (1987) 483 U.S. 756, 765-766 [107 S.Ct. 3102, 3108-3109, 97 L.Ed.2d 618].) Though Detective White's failure to disclose Slawinski's information was improper, the resulting violation of discovery requirements did not, in our view, make the entire guilt or penalty phase fundamentally unfair, much less the trial as a whole.

In *Medina* v. *California* (1992) 505 U.S. 437 [112 S.Ct. 2572, 120 L.Ed.2d 353], the federal high court said: "In the field of criminal law, we 'have defined the category of infractions that violate "fundamental fairness" very narrowly' based on the recognition that, '[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.' [Citations.] The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order." (*Id.* at p. 443 [112 S.Ct. at p. 2576].) Not every discovery violation is a due process violation—only those that undermine confidence in the outcome. Unlike *In re Brown, supra,* 17 Cal.4th 873, in which counsel could have used the evidence to raise a significant question about the petitioner's intoxication at the time of his crimes, they could not have used the informants' testimony to

raise a significant question about Ramage's credibility. His credibility would have been extraordinarily difficult to impeach in any event, and the informants' testimony would have been of little use. His testimony and Saundra Baxter's showed that he volunteered the information about defendant's capability of involvement in Chandler's murder at a time when he, Ramage, was suspected of no crime and could have remained aloof. He revealed information to her that he knew could implicate him in the crimes against ·Charlotte J. The credibility of testimony given by a person who voluntarily and needlessly exposed himself to great criminal liability to provide it was very strong by its nature. It is extremely unlikely, given the relative imperviousness of his credibility to challenge, that the testimony of jailhouse informants would have affected the jury's view of his honesty. And no doubt their testimony would have been impeached as it was at the new trial hearing, further weakening any impeachment of Ramage.

Defendant also contends, in a section of his brief discussing ineffective assistance of counsel issues, that he was denied a "right to competent representation" because of the prosecution's failure to disclose the evidence purportedly showing Ramage's involvement in Chandler's killing. This claim appears to reiterate the claims we have rejected in the preceding paragraphs, and we find it also to lack merit.

*Procedural Claims*

■ Defendant also contends that the trial court erred when it took into account and found not credible his story, originally told at the suppression hearing, that he saw another man escort Chandler to the school grounds. (*Ante*, at p. 398.) He maintains that this version of events was elicited from him, over his objection, by cross-examination that exceeded the scope of direct examination, that because he did not testify at trial it could not be used against him in the prosecution's case-in-chief, and that his right to avoid self-incrimination under the Fifth and Fourteenth Amendment to the United States Constitution and article I, section 24, of the California Constitution were violated. The gravamen of his claims is an assertion that the court could not consider the credibility of his story in denying the new trial motion.

There was no error. Contrary to defendant's assertion, he himself offered the testimony on redirect examination that the trial court found incredible. Hence the government did not violate any constitutional right against self-incrimination, and his state law claim regarding the scope of direct examination also fails. And it was defendant who moved for a new trial on the basis of "all the papers and records on file in this action . . . ." Thus in

considering his testimony, the court did no more than he asked it to do, and it could properly consider the dubiousness of his version of events in denying the new trial motion. (*People* v. *Lee* (1935) 9 Cal.App.2d 99, 106 [48 P.2d 1003].)[12]

Even if error occurred, moreover, it was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].) For the reasons described in the substantive new trial discussion preceding these comments, we are satisfied that the state has shown that the court would have denied the motion even if it had not taken into account defendant's testimony at the suppression hearing.

### Failing to Introduce Jailhouse Informants' Testimony

Defendant further contends that he received the ineffective assistance of counsel·when they failed to introduce the jailhouse informants' evidence of Ramage's involvement at the penalty phase. The record shows that counsel learned of the possibility of the jailhouse informants' statements "[d]uring the latter part of the penalty phase . . . ." Defendant believes that they should have presented evidence on the topic before the penalty phase ended, presumably because it would have changed the jurors' view of his role in the Chandler killing.

Leaving aside any question of deficiency, we see no prejudice. As we have already explained, at most, the jury would have heard evidence that Ramage was present when defendant killed Chandler, and may have helped him as he carried out the murder. In our view, there is no reasonable probability that such new evidence, even if accepted by the jury, would have resulted in a different outcome. It could have proved Ramage's culpability, but would not have lessened defendant's.

### Psychological Effect of Preexecution Confinement

Defendant claims that the long time of his preexecution confinement has itself become a cruel and unusual punishment under the Eighth Amendment to the United States Constitution, because of the psychological effect of having to endure years awaiting execution. He does not ask for a remedy, but we understand him to argue that his death sentence must be reduced to a term of life imprisonment without possibility of parole.

In *People* v. *Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984], we rejected this claim. "Because an appeal is constitutionally mandated,

---

[12]*Lee* was overruled on another point by *People* v. *Perez* (1965) 62 Cal.2d 769, 776, footnote 2 [44 Cal.Rptr. 326, 401 P.2d 934].

defendant's argument is in reality a frontal attack on the validity of the death penalty in all cases. The existence of an automatic appeal under state law is not a constitutional defect; it is a constitutional safeguard." (*Id.* at p. 1014.)

Since we decided *Hill*, other jurisdictions have issued decisions considering the point. But the state of the law has not changed in a way that would cause us to alter the view we expressed in *Hill*.

Notably, in *Pratt* v. *A-G for Jamaica* (Privy Council 1993) 2 A.C. 1 [3 S.L.R. 995, 4 All Eng.Rep. 769], the law Lords decided: "[A] state that wishes to retain capital punishment must accept the responsibility of ensuring that execution follows as swiftly as practicable after sentence, allowing a reasonable time for appeal and consideration of reprieve. It is part of the human condition that a condemned man will take every opportunity to save his life through use of the appellate procedure. If the appellate procedure enables the prisoner to prolong the appellate hearings over a period of years, the fault is to be attributed to the appellate system that permits such delay and not to the prisoner who takes advantage of it. Appellate procedures that echo down the years are not compatible with capital punishment." (4 All Eng.Reps. at p. 786 (per Lord Griffiths).)

*Pratt* observed that "[t]he death penalty in the United Kingdom has always been carried out expeditiously after sentence, within a matter of weeks or in the event of an appeal even to the House of Lords within a matter of months. Delays in terms of years are unheard of." (*Pratt, supra*, 4 All Eng.Rep. at p. 773.) "The *Report of the Royal Commission on Capital Punishment 1949-1953* [citation] gave the average delay in 1950 as six weeks if there was an appeal and three weeks if there was not." (*Ibid.*)

Obviously a different regime prevails here. The Legislature requires an appeal (§ 1239, subd. (b)), which we consider as expeditiously as possible. As long as it is reasonable, the time required for our statutorily mandated review is not a violation of a criminal defendant's constitutional rights; it is essential to ensuring that those rights are and have been respected. This case is far removed from *Elledge* v. *Florida* (1998) __ U.S. __, __ [119 S.Ct. 366, 367, 142 L.Ed.2d 303] (mem. opn. of Breyer, J., dis. from denial of petn. for writ of cert. [prisoner who has spent more than 23 years in prison under sentence of death, in part because of 3 successful appeals, is entitled to be heard on his claim that his execution would constitute an unconstitutional cruel and unusual punishment].)

As we stated in *Hill*, defendant's claim is in reality a facial challenge to the 1978 death penalty law. We have repeatedly held that the 1978 death

penalty law is facially constitutional as a general matter (*post*, next par.), and we adhere to our holding in *Hill* with regard to defendant's claim.

*Other Claims*

Defendant claims that he must be sentenced under the three strikes law. We have rejected this claim (*People* v. *Alvarez* (1996) 14 Cal.4th 155, 246-247 [58 Cal.Rptr.2d 385, 926 P.2d 365]) and decline to reconsider it. Next, he claims that the 1978 California death penalty statute is unconstitutional as a matter of state and federal law. He presents a series of arguments in favor of his view. But as " '[A] general matter at least, the 1978 death penalty law is facially valid under the federal and state charters. . . . We see no need to rehearse or revisit our holdings or their underlying reasoning.' " (*People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1109.)[13]

Defendant claims that his sentence is disproportionately harsh compared to that meted out to Ramage, who apparently received an eight-year prison sentence. "[U]nder article I, section 17 of the California Constitution, defendant is entitled to intracase review to determine whether the death penalty is disproportionate to his personal culpability." (*People* v. *Williams*, *supra*, 16 Cal.4th at p. 279.) Ramage did commit sexual offenses against Charlotte J. But he also gratuitously exposed himself to criminal liability for those offenses so that defendant might be captured. He did not murder anyone, and did not participate at all in the crimes against Yolanda A. or Chandler. We have rehearsed defendant's role in these crimes too often to repeat the details here. His sentence is not disproportionate to Ramage's.

■ Contrary to defendant's claims, the federal Constitution did not require that the jury be specifically instructed on lingering doubt (*People* v. *Mayfield*, *supra*, 14 Cal.4th at p. 807), nor was there any legal requirement that the jury be specifically instructed that death is the greater penalty. With regard to the latter point, the penalty trial itself, including the instructions given, made clear that the state viewed death as the extreme punishment. Indeed, it is the worse punishment as a matter of law. (*People* v. *Memro*, *supra*, 11 Cal.4th at pp. 879-880; *People* v. *Hill*, *supra*, 3 Cal.4th at p. 1016; cf. *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1223 [259 Cal.Rptr. 669, 774

[13]For example, "[d]efendant argues that two sentencing factors set forth in section 190.3 are impermissibly vague under the Eighth Amendment [to the United States Constitution]: factor (a) (circumstances of the capital crime) and factor (b) (other criminal activity involving force or violence). . . . However, the United States Supreme Court has . . . determined that each factor conveys the requisite ' "common-sense core of meaning . . . that criminal juries should be capable of understanding." [Citation.]' (*Tuilaepa* v. *California*, *supra*, 512 U.S. [at p. 973 [114 S.Ct. at p. 2636]].)" (*People* v. *Arias*, *supra*, 13 Cal.4th at p. 187.)

P.2d 698] ["a jury might well conclude that death was 'too good' for the defendant and that life imprisonment with no hope of parole would be the more severe and more appropriate punishment"].)

Defendant also presents "[r]ecent empirical research" that he argues "has shown that jurors comprehend a very small portion of the jury instructions which they are given." Nevertheless, we reject as speculative the claim he bases on his predicate: that "[t]aken as a whole, the instructions given must have been virtually incomprehensible to [his] jury." Nor does such appear to have been the case in practice: for example, the jury found him not guilty of the attempted murder of Yolanda A.

We also reject the following claims: (1) that defendant was entitled to written findings on the aggravating factors; (2) that he was entitled to have the court instruct the jury that it must find death the proper sentence beyond a reasonable doubt, that the aggravating circumstances outweighed those in mitigation beyond a reasonable doubt, and that the aggravating circumstances were true beyond a reasonable doubt; (3) that adjectives such as "extreme" (§ 190.3, factors (d), (g)) or "substantial" (*id.*, factor (g)) act as barriers to considering mitigation; and (4) that the use of a felony to qualify him both for a first degree murder conviction under a felony-murder theory and for a death sentence was impermissible. (*People* v. *Memro, supra,* 11 Cal.4th at pp. 886-887 [referring to all these claims except those under section 190.3, factor (g)].) The court did not err in permitting the jury to hear evidence about the circumstances of his prior violent conduct, whether or not it resulted in convictions. (§ 190.3.) The 1978 death penalty statute does not contain so many special circumstances that it unconstitutionally fails to narrow the class of defendants eligible for the death penalty. (*People* v. *Crittenden, supra,* 9 Cal.4th at pp. 154-156.) ▉ The fact that the prosecutor has discretion to decide whether or not to seek the death penalty " 'does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment.' " (*People* v. *Ray* (1996) 13 Cal.4th 313, 359 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

▉ Finally, defendant contends that any penalty phase error must be evaluated under the harmless-beyond-a-reasonable-doubt standard of *Chapman* v. *California, supra,* 386 U.S. at page 24 [87 S.Ct. at page 828], rather than under our state law reasonable possibility standard. But the two "are the same in substance and effect." (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 965 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Therefore, if "[t]here is no ' "reasonable possibility" ' that the jury would have rendered a different verdict absent [an] error[, then] the error was harmless beyond a reasonable doubt." (*People* v. *Bradford* (1997) 14 Cal.4th 1005, 1061 [60 Cal.Rptr.2d 225, 929 P.2d 544].)

## DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied January 27, 1999, and the opinion was modified to read as printed above.